*In re* MARRIAGE OF FRANCES J. HARDING, Petitioner-Appellant, and ROBERT H. HARDING, Respondent-Appellee.

First District (6th Division) No. 1—88—2114

Opinion filed September 29, 1989.

664

Richard W. Culver, of Richard W. Culver, Ltd., of Hoffman Estates (Mary Ellen Dienes, of counsel), for appellant.

Anthony J. Pauletto, of Skokie, for appellee.

JUSTICE McNAMARA delivered the opinion of the court:

Petitioner, Frances J. Harding, and respondent, Robert H. Harding, were married on June 26, 1954. Dissolution proceedings were instituted in January 1984, and on February 25, 1988, the trial court entered a judgment dissolving the marriage, awarding custody of the parties' youngest child to petitioner, and disposing of contested matters of property, child support and maintenance. In connection with the distribution of property, on March 4, 1988, the trial court entered a qualified domestic relations order (QUADRO) distributing a portion of the Robert H. Harding, M.D., Ltd. Second Restated Employees' Pension Plan and a portion of the Robert H. Harding, M.D., Ltd. Second Restated Employees' Retirement Plan to petitioner. On June 8, 1988, the trial court denied petitioner's section 2—1203 motion to vacate the judgment and/or for a rehearing, retrial or modification of the judgment. (Ill. Rev. Stat. 1985, ch. 110, par. 2—1203.) Petitioner appeals. The dissolution is not at issue.

At the time of trial, petitioner was 56 years old and respondent was 61. The parties had four children: Pamela, age 28; Rhonda, age 26; Laura, age 19; and Andrea, age 14. Laura was attending the University of Wisconsin, and Andrea was living in the marital home with petitioner.

Prior to the parties' marriage, petitioner graduated from nursing school and received a registered nursing certificate. Respondent graduated from the Marquette Medical School in 1953. After the parties married, they moved to Cleveland, Ohio. Respondent completed his residency in dermatology at a Cleveland clinic while petitioner worked as a nurse at the clinic and as a private duty nurse. The parties remained in Cleveland for three years. During that time, they lived on petitioner's income and on the $1,000-per-year fellowship which re-

spondent received during his residency.

In July 1957, the parties moved to the Chicago area and respondent opened his medical practice in Arlington Heights. Petitioner initially worked as a nurse for another doctor in respondent's office. Petitioner worked each morning and part of the afternoon for the other doctor, and then she worked for respondent and answered his telephone. Petitioner continued employment outside the home until April 1958, when she gave birth to the parties' first child. After that, all of the files and financial cards of respondent's patients were brought home, where petitioner worked on them. One room of the parties' home was set up as an office where petitioner worked on respondent's books. Petitioner estimated that she prepared billings for 700 to 800 patients per month. Petitioner also monitored and prepared billings for overdue accounts.

Each day after work, respondent took the day's receipts in cash and in checks, as well as all of the mail, to the marital home and turned them over to petitioner. The cash averaged $1,000 per week. Petitioner added up the cash and put the total amount on top of the daily sheet. She also kept a record of the gross receipts. She sent the daily gross income figures to William Hogan, the parties' business manager, each month.

Petitioner testified that she placed the cash received from respondent's medical practice each week in a drawer in their home. She then used the $1,000 cash each week to pay for food, dry cleaning, gas, and other family expenses. Petitioner wrote a check each week on the parties' personal account in the amount of the weekly cash collected. She deposited that check into the corporate bank account for respondent's medical practice. Petitioner also deposited a check for $7,200 each month from the business account into the joint account for living expenses.

Respondent testified that this was the practice followed by the parties during the course of their marriage, but stated that the amount of cash kept in the drawer was approximately $50. Respondent had no contact or control over the monies he turned over to petitioner. Additionally, petitioner signed both parties' names to all tax returns and hired consultants, financial advisors and accountants. Respondent testified that he occasionally wrote checks.

In addition to the daily receipts from respondent's practice, all of the bookkeeping records were sent to petitioner. The office receptionist sent home a list of all the patients seen that day and the amount of the charge. The patient cards also were sent home. Each day, petitioner opened all the records that were sent home and sorted through

the patient cards. She prepared account cards for new patients and entered the appropriate data on all patient cards.

Once each week, petitioner photocopied and filed the checks. Petitioner then asked one of the children to endorse all of the checks with a stamp. Pamela, the oldest child, testified that when she was a child, she helped her mother file biopsy slips, and alphabetize and endorse checks. Petitioner had a part-time typist helping her at home with the work from respondent's medical practice.

Petitioner additionally handled patient inquiries regarding their bills and insurance information. She processed insurance forms and handled problems with unemployment compensation. Petitioner paid all of the bills and prepared the payroll.

Petitioner testified that she spent 45 to 50 hours per week just to keep the books of the medical practice current. Pamela testified that petitioner worked on the paperwork for 12 to 14 hours a day, 7 days a week. Hogan testified that in his opinion, 100 hours a week "might be a bit long," but stated that the paperwork for respondent's practice required a staff of two or three people. Petitioner began drawing a salary for her work in 1969. During the last two or three years she was involved in respondent's practice, she grossed approximately $25,000 per year. On the advise of Hogan, petitioner placed the children on the payroll for the work which they performed for the medical practice. During the four-year period from 1980 to 1984, the children were paid a total of $45,000 in gross wages for the work they performed.

Respondent testified that he worked 70 hours a week, 10 to 14 hours daily during his peak years. He stated that he saw 600,000 patients in 30 years. Various witnesses testified that respondent saw 60 to 75 patients per day, or 400 to 600 patients per week. Hogan testified that respondent's practice was in the 90th to 95th percentile in terms of volume. Respondent stated he was in the top 2% of the dermatologists in the country in terms of the volume of patients. Respondent went on very few vacations, although he attended some medical conventions.

Both parties are in relatively good health. Respondent is a diabetic. He walks 15 miles a week and plays golf three times a week. Petitioner is under the care of a physician for hypertension, for which she takes medication. She suffers from arthritis in the pelvis, knees, neck and hands, and takes aspirin to relieve the symptoms of her arthritis. Petitioner additionally suffers from a chronic bladder infection, for which she takes medication.

Both parties were collectors of various items. Respondent had a

military history library of 16,000 volumes and other war memorabilia. He valued the collection at $150,000. Petitioner had a stamp collection. She testified that over the years, she spent $175,000 on stamps. Respondent testified that petitioner actually had spent between $200,000 to $225,000 on the collection. An expert, however, appraised the stamp collection, as it existed in August 1987, and set its value between $8,000 and $12,000. Petitioner additionally collected playing cards. An appraiser placed a value of $2,000 to $3,500 on that collection.

During the course of the marriage, the parties entered into several investments. They purchased an interest in development property in Hawaii for $42,000. They purchased an interest in two motels in Arizona. The Arizona motel investment currently generates $429 per month. The parties also purchased property in Colorado for $10,000. Respondent testified that this property now is worth only $1,000. In addition to the investment properties, the parties own a home in Mount Prospect, valued at $300,000, and a condominium in Lake Geneva, valued at $54,500. They also jointly own a vacant lot in Barrington. Respondent has an interest in a medical laboratory valued at approximately $1,000.

Petitioner testified that in 1969, the parties borrowed $30,000 from her mother in order to pay for some investments they made at the recommendation of their financial advisors. The note, dated November 22, 1969, had not been repaid, although beginning in 1970, the parties commenced paying petitioner's mother 8% interest on the note and took an interest deduction on their joint income tax returns. Petitioner signed both her name and respondent's name on the note. Respondent testified that he was not aware of the loan but that he imagined his accountant would be aware of it.

Respondent testified that he had several money accounts. The defined benefit plan showed a value as of December 31, 1987, of $970,570.82 and the money purchase plan showed a value of $873,383.04 as of the same date. Additionally, the Robert H. Harding, M.D., Ltd. Trust showed a value on that date of $709,722.80. Respondent's personal interest in the pension and profit-sharing plans was between $45,000 and $75,000.

The parties ceased living together on February 8, 1984. At that time, petitioner's employment with the medical practice ended, and she has had no employment income since then. At the time of trial, petitioner had approximately $2,200 in her two checking accounts. Respondent testified that he had $6,000 or $7,000 in his checking account and approximately $1,700 in his money market account. A

statement from his money market account, however, reflected that as of December 7, 1987, the balance in the money market account was $14,703.88 and the balance in the checking account was $3,750. Respondent testified that he had transferred $8,000 from the money market account to the checking account. He also testified that he had made additions to the account since December 7, 1987.

On March 7, 1984, an agreed injunction order was entered restraining and enjoining the parties from "withdrawing, spending, disposing of, gifting, destroying, removing, encumbering, transferring, damaging, pledging, hypothecating, or otherwise dealing with" a specified list of properties. Among the properties listed were the living trust account of each party and respondent's medical practice.

Despite the injunction, petitioner reduced her living trust account by approximately $100,000 during the four years in which the dissolution proceedings were pending. She stated that the funds were needed to meet her monthly expenses. Prior to the withdrawal of the injunctive order, respondent sold his medical practice to Dr. Scott Glazer. Respondent used $53,868 of the proceeds from the sale to purchase property located at 1220 Vine Street.

The trial court determined that the parties' assets and liabilities were as follows:

| Liabilities | |
| --- | --- |
| Promissory Note to petitioner's mother | $ 30,000 |
| Mortgage on 1220 Vine Street property | 131,136 |
| Total Liabilities | 161,136 |

| Assets | |
| --- | --- |
| Marital Home | 300,000 |
| Lake Geneva Condominium | 54,500 |
| Barrington Lot | 50,000 |
| Equity in 1220 Vine Street property | 53,868 |
| Motel 6 | 56,000 |
| Hawaii property | Unknown |
| Furnishings in marital home | Unknown |
| Furnishings in Lake Geneva condominium | Unknown |
| Colorado property | 1,000 |
| Medical Lab | 1,000 |
| Medical practice (at time of sale) | 247,977 |
| Respondent's checking account | 8,000 |
| Respondent's money market account | 1,700 |
| Petitioner's account (Lake Geneva) | 700 |
| Petitioner's account (Mt. Prospect) | 1,500 |

| | |
|---|---:|
| Respondent's military books | 150,000 |
| 1983 Oldsmobile | 5,300 |
| 1984 Cadillac | 15,250 |
| Petitioner's stamp collection | 150,000 |
| Respondent's pension plan | 873,383 |
| Respondent's trust account | 709,723 |
| Respondent's deferred benefit plan | 970,571 |
| Petitioner's living trust | 120,000 |
| Petitioner's card collection | 2,000 |
| Petitioner's inheritance (Not valued as a marital asset) | |
| Respondent's personalty (Not valued as a marital asset) | |
| Check No. 4310 dated 7/3/78 | 25,600 |
| Check dated 03/83 | 22,000 |
| Petitioner's net deposits (Mt. Prospect) | 253,750 |
| **Total Assets** | **$4,073,823** |

The trial court later determined that the value of respondent's medical practice was $118,750.

The trial court determined that the parties' assets should be distributed 40% to petitioner and 60% to respondent. Petitioner was awarded the following property: the marital home, the Lake Geneva condominium, the Motel 6 investment in Arizona, all the furnishings and furniture located in the marital home and the Lake Geneva condominium, all bank accounts held in her name, individually or jointly with others, the 1984 Cadillac, the stamp collection, and all other collections previously maintained by petitioner. Respondent was awarded the following property: the property located at 1220 W. Vine, the Barrington lot, all bank accounts held in his name, individually or jointly with others, the 1983 Oldsmobile, the military book collection, items of personal property, the Colorado property, the medical lab interest, and his living trust account. The Hawaii property investment was split between the parties, each receiving an undivided 50% interest.

The trial court awarded custody of Andrea to petitioner, with reasonable visitation to respondent. Respondent was ordered to pay to petitioner the sum of $800 per month as and for child support. Respondent additionally was ordered to pay the sum of $6,000 per year for the college expenses of Laura. Respondent was to maintain Laura and Andrea as beneficiaries under his living trust account in an amount of $50,000 each until age 23 or prior emancipation. Finally,

respondent was to be responsible for all extraordinary medical, dental and optical expenses for Laura and Andrea, and petitioner was to be responsible for all medical, dental and optical expenses of $100 or less. The trial court denied maintenance to both parties.

Each of the parties was ordered to release and waive any interest in the other's accrued benefits in the defined benefit plan and in the money purchase pension plan. Petitioner was awarded an amount which, when combined with her accrued benefit under both plans, equals $559,375 under the money purchase pension plan. Petitioner's award was accomplished through a QUADRO under the Retirement Equity Act of 1984 as defined in IRS Code section 414(p) (26 U.S.C. §414(p) (Supp. V 1987)).

The trial court found that the $30,000 note to petitioner's mother was solely petitioner's liability, and that the $131,136 mortgage on the 1220 Vine Street property was solely respondent's liability. Moreover, the trial court found that petitioner had failed to account for various marital assets, and accordingly, charged her with dissipation of those assets. Specifically, the court found that petitioner had failed to explain the source of a total of $253,751 in deposits to the Mt. Prospect bank account between 1979 and 1987. The court additionally charged petitioner with dissipation of two checks, one dated July 3, 1978, in the amount of $25,600 and one dated March 1983 in the sum of $22,000, and with dissipation of $120,000 from her living trust account. The court found that petitioner had not been candid in her explanations of her handling of the funds turned over to her by respondent after each work day.

Petitioner first contends that the trial court's award of 60% of the marital property to respondent and 40% to petitioner, while denying petitioner maintenance and limiting child support, was against the manifest weight of the evidence. Petitioner claims this error was compounded when the court found that petitioner had dissipated marital property, in classifying certain property as nonmarital, and in failing to assign correct values to certain property. Petitioner also claims that the trial court erred in denying her section 2—1203 post-trial motion.

■ We first consider petitioner's argument that the trial court erred in awarding 60% of the marital property to respondent, while awarding 40% to her. We believe that the court's initial determination with respect to the proportionate share of the assets which each party was to receive was not an abuse of its discretion. Section 503(d) of the Illinois Marriage and Dissolution of Marriage Act (Act) directs the court to divide the parties' property in just proportions. (Ill. Rev.

Stat. 1987, ch. 40, par. 503(d).) An equitable award, however, does not require that the marital estate be divided equally. (*In re Marriage of Randall* (1987), 157 Ill. App. 3d 892, 510 N.E.2d 1153.) The trial court's distribution of marital property rests within its sound discretion and will not be disturbed on review absent an abuse of that discretion. (*In re Marriage of Heller* (1987), 153 Ill. App. 3d 224, 505 N.E.2d 1294.) An abuse of discretion occurs only when no reasonable person would take the view adopted by the trial court. *In re Marriage of Brooks* (1985), 138 Ill. App. 3d 252, 486 N.E.2d 267.

■■ Section 503(d) refers to the factors which a court may consider when apportioning the property. These factors include the following: each spouse's contribution to or dissipation of the marital property; the value of the property set apart to each spouse; the duration of the marriage; the relative economic circumstances of the parties; the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties; the custodial provisions for any children; whether the apportionment is in lieu of or in addition to maintenance; the opportunity of each spouse for future acquisition of capital assets and income; and the tax consequences of the property division upon the respective economic circumstances of the parties. (Ill. Rev. Stat. 1987, ch. 40, par. 503(d).) The trial court here considered the foregoing factors, and we cannot say that its conclusion that respondent was entitled to 60% of the property and that petitioner was entitled to 40% is an abuse of discretion.

We next address the various property valuation, classification, and distribution issues raised by petitioner.

Petitioner challenges the valuation of several assets. Turning to the valuation of respondent's medical practice, the court valued respondent's medical practice at $118,750. Each party was awarded 50% of that amount, or $59,375. Petitioner alleges that the trial court's valuation was incorrect in view of the purchase agreement and the consultation agreement into which respondent entered. We agree.

In 1985, respondent entered into an agreement to sell his medical practice to Dr. Scott Glazer. Dr. Glazer and respondent signed both a purchase agreement and a consultation agreement. The purchase agreement provided that Dr. Glazer would pay $37,000 for the acquired assets of the practice. The purchase agreement additionally provided that the sale of the practice was subject to the delivery of a consultation agreement by respondent to Dr. Glazer. The consultation agreement provided that Dr. Glazer would hire respondent as a consultant during two consultation periods: a 12-month initial consulta-

tion period at $10,760 per month (totalling $129,228) and a second consultation period at $4,541.66 per month (totaling $217,999.68). Petitioner maintains that the trial court erroneously concluded that the monies due under the initial consultation period and a portion of the monies due under the second consultation period were not marital property. Petitioner claims that the proper value of the medical practice is $384,227.68.

Respondent maintains, however, that the trial court properly valued the practice at $118,750. Respondent notes that he elected to waive the initial 12-month consultation period, due to commence on August 1, 1985, and to continue through July 31, 1986, and instead continued to practice medicine on his own. Thus, respondent concludes that petitioner is not entitled to any portion of the monies he would have received had he elected to work under the initial consultation period. Respondent additionally notes that at the time of the dissolution, he was due $131,708.14. He argues that petitioner is not entitled to any portion of those monies. We note, however, that respondent testified that the value of the practice was $255,000.

■ We believe the trial court abused its discretion by failing to take into account the entire value of the medical practice when apportioning the parties' assets. The principal evidence of value of the practice presented by either party was the purchase agreement and the consultation agreement. Nonetheless, the trial court failed to include all of the elements of those agreements in valuing the practice. A plain reading of those documents shows that all of the components of the transfer were essential parts of the consideration involved in the sale of the practice. The fact that respondent elected to waive the monies due under the initial consultation period should not impair petitioner's portion of the marital assets. Moreover, the consultation agreement provided with respect to the 48-month consultation period at $4,541.66 per month that, in the event of respondent's death, a minimum of $100,000 would be payable to his estate regardless of the monthly installments earned. Accordingly, the $100,000 sum was absolutely vested and the trial court's failure to consider this sum was error, as was its failure to consider respondent's election to waive the monies due under the initial consultation period.

Despite the fact that petitioner testified that she had spent $175,000 on her stamp collection, she next maintains that the trial court erred in valuing her stamp collection at $150,000. Respondent believed that petitioner spent between $200,000 and $225,000 on the collection.

The trial court heard the testimony of Theodore Gulino, a philate-

list. Gulino examined 45 volumes of stamps and concluded their present value was between $8,000 and $10,000. He additionally stated that it was hard to imagine any more than $25,000 to $30,000 being spent to amass the collection he viewed. He believed the most petitioner might realize from the sale of the stamps would be $12,000.

When the trial court's valuation of $150,000 was questioned at the section 2—1203 hearing, the court explained that it did not believe the testimony as to value. The court then clarified its explanation by stating that it believed the appraiser, but that it did not believe the appraiser saw the entire collection. Finally, the court ruled that it was not bound by the testimony of the expert.

The trial court did not abuse its discretion in determining that the value of petitioner's stamp collection was $150,000. Both parties testified that petitioner spent in excess of that amount on the collection. The trial court was entitled to utilize purchase price as a valuation tool (*Mineika v. Union National Bank* (1975), 30 Ill. App. 3d 277, 332 N.E.2d 504), and to disregard the testimony of the expert (*Clifford-Jacobs Forging Co. v. Industrial Comm'n* (1960), 19 Ill. 2d 236, 166 N.E.2d 382), particularly in view of the fact that the trial court specifically noted that it did not believe the expert had seen the entire collection amassed during the marriage.

Petitioner next challenges the trial court's valuation of her living trust. In this connection, petitioner also argues that the trial court erred in its valuation of her Mt. Prospect checking account. Petitioner maintains that the trial court based its valuations of these accounts on the erroneous conclusion that she had not rebutted respondent's allegations of dissipation of cash receipts from the medical practice.

The parties agree that petitioner had exclusive control of the cash receipts from respondent's medical practice. Respondent presented evidence of deposits to petitioner's personal checking account at the Mt. Prospect bank to show that petitioner had deposited $349,756.55 into her account from 1979 through 1987. The court stated that petitioner's failure to present evidence on the source of those deposits was the basis of its finding of dissipation. The court then used this finding to determine the value of petitioner's accounts.

We believe the trial court erroneously charged petitioner with dissipation of the cash receipts from the medical practice. Under section 503(d)(1) of the Act, the court may consider the dissipation of assets when apportioning the marital property. (Ill. Rev. Stat. 1987, ch. 40, par. 503(d)(1).) Dissipation may be found when one spouse uses marital property for his or her own benefit and for a purpose unrelated to the marriage at a time at which the marriage is undergoing

an irreconcilable breakdown. (*Klingberg v. Klingberg* (1979), 68 Ill. App. 3d 513, 386 N.E.2d 517.) Where the funds are spent for legitimate family expenses, and necessary and appropriate purposes, there is no dissipation. (*In re Marriage of Sevon* (1983), 117 Ill. App. 3d 313, 453 N.E.2d 866.) Dissipation of marital assets by one spouse in contemplation of dissolution of marriage is not an acceptable practice. (*In re Marriage of Hellwig* (1981), 100 Ill. App. 3d 452, 426 N.E.2d 1087.) To show dissipation, however, it is not necessary that the marital property be sold or transferred at the time of separation or after dissolution proceedings are instituted. Such a requirement is overly restrictive. *In re Marriage of Hellwig*, 100 Ill. App. 3d 452, 426 N.E.2d 1087.

■ Although the trial court suggested that it believed the irreconcilable breakdown occurred at the point at which petitioner stopped cooking for respondent, we find no evidence of an irreconcilable breakdown of the marriage until the point at which petitioner filed for dissolution of marriage. Moreover, our review of the record reveals no evidence that petitioner used the cash receipts from the practice for her sole benefit and for a purpose unrelated to the marriage. (See *Klingberg v. Klingberg*, 68 Ill. App. 3d 513, 386 N.E.2d 517.) To the contrary, petitioner offered uncontradicted evidence that she used the cash receipts each week to pay for household and family expenses such as food, cleaning bills, and automobile expenses. Accordingly, we do not believe that petitioner properly may be charged with dissipation of the cash from respondent's medical practice.

We are not unmindful of the recent decision, *In re Marriage of O'Neill* (1989), 185 Ill. App. 3d 566, in which the court stated that dissipation is not limited to a period of time when there is an irreconcilable breakdown of the marriage. Because we have determined that no evidence exists which suggests that petitioner used the funds for an inappropriate purpose, we need not base our decision solely on the presence of an irreconcilable breakdown. Accordingly, we are not constrained to rule according to the *O'Neill* decision. Furthermore, we do not believe that respondent can participate in a course of conduct for a period of 30 years and then complain that petitioner has dissipated funds. Respondent testified that he freely turned over the earnings from his medical practice to petitioner each day. Hogan testified that respondent could have taken control of the funds at any time, but did not.

In addition, we believe the trial court improperly concluded that petitioner failed to explain the source of the deposits to her Mt. Prospect account. The court recognized that petitioner had received

$2,000-per-month maintenance for 48 months, for a total of $96,000, and accordingly, found that petitioner adequately accounted for only $96,000 of the $349,756.55 in deposits to her account.

Our review of the record reveals that petitioner has sufficiently accounted for much of the remaining deposits. First, petitioner did not merely receive $2,000 per month in maintenance for the 48 months in question. Rather, petitioner received $2,850 per month as maintenance and child support. Accordingly, the court improperly determined that she had accounted for only $96,000. Moreover, petitioner deposited $59,407.35 from her salary to the Mt. Prospect account. She also deposited a $19,000 inheritance into the account. Thus, the trial court erred in charging her with dissipating $253,756.55.

█ We find, however, that the trial court correctly concluded that petitioner dissipated $101,000 from her living trust account. This withdrawal was made during the pendency of these proceedings. We find her bare assertion that the funds were used to pay necessary expenses, combined with the fact that she had filed for dissolution, thus signalling an irreconcilable breakdown in the marriage, permits a finding of dissolution of the $101,000.

Petitioner additionally contends that the trial court erred in charging her with the dissipation of two checks, totaling $47,600, both of which were written prior to the filing of the petition for dissolution. The first check, dated July 3, 1978, and in the amount of $25,600, was drawn by petitioner on the parties' joint checking account. Petitioner testified that the proceeds of that check went into one of the parties' investments. The second check, dated March 1983, and in the amount of $22,000, was not produced by respondent at trial. Petitioner, however, testified that the check was used to pay respondent's 1983 medical corporation tax. Respondent admitted that Frank Olesuck, the parties' financial consultant, and Hogan had advised him that the $22,000 had been so used.

The trial court erroneously concluded that petitioner had dissipated the $47,600. There was no evidence presented to support the conclusion that petitioner used either check for purposes unrelated to the marriage. Rather, the only evidence presented supported the contrary conclusion. Moreover, there was no evidence that when either check was written, the marriage was undergoing an irreconcilable breakdown. The trial court erred in finding dissipation.

Petitioner next alleges that the trial court erred in refusing to charge respondent with dissipation. She maintains that respondent was not charged for his use of $54,788 of the proceeds from the sale

of his medical practice to purchase the Vine Street home, for his use of the income received from the parties' Arizona motel investment, or for his use of funds from his money market account.

■ Use of marital property to secure housing after leaving the marital home is an expenditure for a purpose unrelated to the marriage. (*Cf. In re Marriage of Partyka* (1987), 158 Ill. App. 3d 545, 511 N.E.2d 676.) Accordingly, petitioner asserts that respondent should be charged with dissipation of the funds which he used to purchase the Vine Street property. The fact is that the judgment of dissolution reveals that he was charged with the dissipation of the proceeds of the Vine Street property. Indeed, he was charged twice for the use of the funds. The trial court awarded both parties 50% of the value of the medical practice, or $59,375 each. The trial court additionally awarded respondent equity in the Vine Street property in the sum of $53,868. The source of the monies used to acquire this equity, however, was the proceeds from the sale of the medical practice, and these proceeds formed the basis of the court's valuation of the practice. Accordingly, the trial court double-counted the monies used to purchase the Vine Street property, once as equity in the property, and once as value of the medical practice. Thus, the figure representing the total assets awarded to respondent is improperly inflated in the sum of $53,868 and should be reduced by that figure.

■ The trial court erred in failing to charge respondent with dissipation of the income from the Motel 6 Arizona investment. The interest in the property was held jointly by the parties. During the pendency of the dissolution proceedings, respondent kept the $429 monthly income from the investment, for a total of $20,592. These proceeds should have been included in the parties' assets and should have been considered by the trial court when it distributed the assets. Respondent's allegation that it was sufficient to consider those funds when determining his income for purposes of temporary maintenance and child support is without merit. The funds were a marital asset which should have been included in the trial court's determination of the parties' assets and liabilities.

■ In this court, respondent has not responded to petitioner's claim that respondent had accounted for only $8,000 of $13,003.38 missing from a money market account. Accordingly, respondent has waived the issue for purposes of this appeal. (See *Sheley v. Guy* (1975), 29 Ill. App. 3d 361, 330 N.E.2d 567; 107 Ill. 2d Rules 341 (e)(7), (f).) Thus, the trial court erred in not charging respondent with dissipation of a portion of his money market account.

Petitioner also maintains that the trial court improperly assigned

to her the entire amount of a $30,000 liability on a note due petitioner's mother. Petitioner testified that in 1969, the parties borrowed the money from her mother in order to cover investments which the parties had made. The loan was evidenced by a note signed on November 22, 1969. Petitioner signed both her name and respondent's name to the note, which has never been repaid. Respondent maintains that he knew nothing about the loan, although he imagined his accountant was aware of it.

■■ Initially we note that we do not find significant the fact that petitioner signed both her name and respondent's name to the note, or to any other documents which the parties were to execute. Respondent conceded that petitioner had his authority to sign such documents.

■■ With respect to the $30,000 promissory note, the trial court determined that petitioner's testimony was not credible. Accordingly, the court assigned the entire liability to her. We believe this assignment to have been erroneous. Although respondent claimed he was unaware of the loan, he did not dispute the fact that beginning in 1970, the parties began paying petitioner's mother 8% interest on the loan, and began deducting this interest on the parties' income tax returns. We do not believe respondent can accept a benefit, in the form of an income tax deduction, for 14 years, and then dispute the existence of the source of that benefit. We find that the trial court erroneously assigned the entire liability to petitioner.

Petitioner next contends that the trial court erred in failing to award her maintenance. Petitioner maintains that she lacks sufficient property to provide for her reasonable needs and that she is unable to support herself through appropriate employment.

Section 504(a) of the Act provides that a court may grant maintenance only if it finds that the spouse seeking maintenance lacks sufficient property, including marital property apportioned to her, to provide for her reasonable needs; is unable to support herself through appropriate employment; or is otherwise without sufficient income. (Ill. Rev. Stat. 1987, ch. 40, par. 504(a).) Maintenance is to be awarded in such amounts and for such periods of time as the court deems just, after consideration of various factors, including the following: the time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment; the standard of living established during the marriage; the age and the physical and emotional condition of both parties; and the ability of the spouse from whom maintenance is sought to meet his or her needs while meeting those of the spouse seeking maintenance. (Ill.

Rev. Stat. 1987, ch. 40, par. 504(a). See also *In re Marriage of Heller* (1987), 153 Ill. App. 3d 224, 505 N.E.2d 1294.) An award of maintenance will not be overturned absent an abuse of discretion by the trial court. *In re Marriage of Heller*, 153 Ill. App. 3d 224, 505 N.E.2d 1294.

We find that the trial court's denial of petitioner's request for maintenance was not an abuse of its discretion. The trial court heard testimony regarding the factors set forth above. We believe the trial court reasonably concluded that petitioner was not entitled to maintenance.

Petitioner was awarded $560,000 of respondent's defined benefits plan, which earns 7.5% or $42,000 per year; the Motel 6 investment which pays $429 per month, or $5,148 per year; $9,600-per-year child support; and $6,000-per-year educational expenses. These assets provide petitioner with a total of $62,748 per year. Petitioner testified that the total monthly expenses for herself and for her two daughters was $4,202 per month, or $50,404 per year before taxes. Accordingly, the assets awarded to petitioner generate income sufficient to meet her needs.

Petitioner next contends that the award of child support for the parties' minor child, Andrea, was inadequate. At the time of the dissolution, Andrea was 14 years old. She lived on a full-time basis in the marital residence with petitioner. The trial court ordered respondent to pay petitioner $800 per month as and for child support for Andrea. The order additionally directed that respondent was entitled to claim Federal and State income tax exemptions for Andrea. (The order also gave respondent the tax exemptions for Laura, who was attending college at the time of the dissolution.) Petitioner maintains that the child support award was not sufficient given the educational needs of Andrea, the relatively superior financial resources of respondent, and the standard of living which Andrea would have enjoyed had the parties' marriage not been dissolved.

Determination of an amount of child support lies within the sound discretion of the trial court and its decision will not be set aside unless contrary to the manifest weight of the evidence. (*Sandberg v. Sandberg* (1973), 11 Ill. App. 3d 495, 297 N.E.2d 654.) Section 505 of the Act governs the trial court's award of child support. (Ill. Rev. Stat. 1987, ch. 40, par. 505.) That section provides that the court is to determine the minimum amount of support by using a set of guidelines. (Ill. Rev. Stat. 1987, ch. 40, par. 505(a)(1).) These guidelines provide that for one child, the supporting party is to contribute 20% of his or her net income as and for that child's support. (Ill. Rev. Stat.

1987, ch. 40, par. 505(a)(1).) The section further provides that the guidelines *shall* be applied unless the court, after considering evidence presented on all relevant factors, finds a reason to deviate from the guidelines. (Ill. Rev. Stat. 1987, ch. 40, par. 505(a)(2).) Relevant factors include the following: the financial resources of the child, the financial resources and needs of the custodial parent; the standard of living the child would have enjoyed had the marriage not been dissolved; the physical and emotional condition of the child, and his educational needs; and the financial resources and needs of the noncustodial parent. (Ill. Rev. Stat. 1987, ch. 40, par. 505(a)(2).) In making a child support award that is less than the 20% guideline, the court must consider all the relevant factors set forth in the statute. (*In re Marriage of Cook* (1986), 147 Ill. App. 3d 134, 497 N.E.2d 1029.) Moreover, if the court orders a lower award, based on consideration of the foregoing factors, it must make express findings as to its reasons for doing so. Ill. Rev. Stat. 1987, ch. 40, par. 505(a)(2).

 We believe that, here, the trial court did not meet the express findings requirement of the Act. In its memo for judgment, the trial court awarded $800-per-month child support, but gave no specific findings. At the hearing on the section 2—1203 motion, petitioner pointed out that the $800 monthly child support was considerably less than the 20% statutory guideline. The court responded as follows:

"Counsel, you won that one. You won that one. Certainly it was the intent of this court—By my memo of judgment, it was the intent of this Court to give Andrea 20% of the doctor's net pay, period. And if the judgment just provided $800, there has to be a fixed figure. So if the judgment just provided $800 a month for Andrea, it should have been $800 a month or 20 percent of his net take-home pay. And that's easy. You won that one. There is no question about that point, period."

Minutes later, however, the court stated that the 20% requirement of section 505 did not have to be followed. The court then stated that the child support obligation was joint and that, accordingly, petitioner also had an obligation. The court stated that its position was that the express findings requirement of the Act had been met. Our review of the record, however, reveals only vague references to the factors listed within section 505, and none within the framework of the child support provision of the Act.

Furthermore, our review of the record reveals no evidence which would suggest that the statutory 20% guideline should not be met. The Act requires the court to consider the standard of living that Andrea would have enjoyed had the marriage not been dissolved (Ill.

Rev. Stat. 1987, ch. 40, par. 505(a)(2)(c)), and that standard of living should not be substantially impaired simply because her parents have chosen to seek dissolution. See generally *In re Marriage of Leva* (1983), 125 Ill. App. 3d 55, 460 N.E.2d 1179.

■ Finally, we do not believe that the trial court's award of child support was based on accurate financial data. Respondent submitted financial statements indicating that his gross income for the first nine months of 1987 was $96,278. After subtracting the comparable nine-month permitted deduction figures totalling $58,400, respondent indicates that his net income for that nine-month period was $37,878, or $4,209 per month. Twenty percent of $4,209 is $842. Thus, respondent concludes that the trial court's award of $800 per month is appropriate, particularly in view of the fact that the trial court specifically found that petitioner was required to contribute a portion of the child support.

Petitioner points out, however, that respondent's financial statements fail to take into account the fact that respondent was awarded the income tax deductions for the parties' two youngest daughters. Moreover, the statements fail to include as income the interest earnings from respondent's defined benefit plan, his trust, and his money purchase plan. Respondent noted at oral argument that these earnings are automatically reinvested and concluded that they should not be included in his projected income figures. We disagree. The fact that respondent chooses to reinvest this income does not mean that the income should not be considered for purposes of an award of child support. This is particularly true in view of the fact that respondent includes the income generated by petitioner's portion of the benefit plans when he approximates petitioner's income.

In sum, because we are unable to find evidence which would support a lesser figure, we find that the statutory 20% child support guideline should be applied in this case, and we direct the trial court to recompute the income of both parties, and to fashion its support award to consider the corrected income figures.

■ Petitioner additionally contends that the provision relating to extraordinary medical, dental and optical expenses for the two younger children of the parties is vague and ambiguous.

The trial court's initial memo for judgment contained the following provision:

"6) The Respondent shall be responsible for all extraordinary medical, dental and optical expenses for Laura and Andrea, and, the Petitioner shall be responsible for all medical, dental and optical expenses of $100.00 or less. The Respondent shall

keep Laura and Andrea covered under his current medical insurance. The obligations set forth herein shall cease upon each child attaining the age of 23 or prior emancipation."

On June 8, 1988, the court amended the provision as follows:

"[P]aragraph six (6) is amended to provide that Petitioner is responsible for all medical, dental, and optical expenses for the two children (one minor and one attending college) for a total of one hundred ($100.00) or less for each ailment. The Respondent is responsible for all other medical expenses and are classified [sic] extraordinary medical, dental and optical expenses."

We believe the language of the judgment and of the amended provision is clear and can be understood by both parties. There is no need for further clarification.

Petitioner lastly contends that the trial court abused its discretion in denying her section 2—1203 motion to vacate the judgment without an evidentiary hearing. In view of our holdings, we deem it unnecessary to consider that argument.

For the reasons stated, the order of the circuit court of Cook County denying maintenance to petitioner is affirmed. The order awarding child support to petitioner is vacated as to the amount allowed, and the matter is remanded for recomputation in accordance with the views expressed herein. The order granting 60% of the marital property to respondent and 40% to petitioner is affirmed, but the order regarding dissipation of property and the assignment of values and distribution as to certain property is reversed and the cause is remanded for further proceedings in accordance with our expressed views. The order dealing with the payment of medical expenses by respondent is affirmed.

Affirmed in part; reversed and remanded in part.

EGAN, P.J., and LaPORTA, J., concur.