*In re* MARRIAGE OF FINDLEY MAHAFFEY, Petitioner-Appellant, and NORMA MAHAFFEY, Respondent-Appellee.

First District (5th Division)   No. 1—88—1734

Opinion filed November 30, 1990.

---

Kalcheim, Schatz & Berger, of Chicago, for appellant.

Thomas Holstein and Michael Long, both of Chicago, and Alfred L. Levinson, of Park Ridge, for appellee.

JUSTICE GORDON delivered the opinion of the court:

Petitioner, Findley Mahaffey, appeals from the judgment of the trial court dissolving his marriage to respondent, Norma Mahaffey. He contends that the trial court: (1) erred in characterizing a lottery jackpot won during the marriage as marital property, and (2) abused its discretion in dividing the marital property. We affirm.

The evidence presented at trial disclosed that the parties married in April of 1965 and gave birth to two children, Margaret and Paula,

who were 19 and 16 years of age, respectively, at the time of the trial. During the marriage, petitioner, who at trial was 49 years of age, worked in a series of unskilled and skilled jobs, earning as much as $21 an hour, and respondent, who was 53 years of age, worked primarily as the family's homemaker. In 1981, however, respondent began working outside the home as a nursing assistant for a little over the minimum wage after petitioner was injured in an automobile accident and temporarily could not work. Prior to petitioner's accident in 1981, the parties basically met their expenses with his earnings, but, thereafter, they began falling into debt. By May of 1983, the parties, who were living in a rented house in Matteson, Illinois, remained in debt and had acquired only minimal assets.

In May of 1983, the parties' lives changed considerably when one of them purchased the winning ticket in the Illinois lottery, worth approximately $3.6 million. Though there was a dispute in the evidence over who purchased the winning ticket and a charge that respondent committed perjury when she testified that she selected the winning numbers based on her children's birthdays, both of these matters are not dispositive of the issues presented by this appeal. What is significant, however, is the undisputed evidence that the money used to purchase the ticket came from either petitioner's or respondent's marital earnings and the right to receive the full lottery payments became irrevocable during the marriage. The single premium annuity contract purchased from Standard Security Life Insurance Company of New York (hereinafter Standard Security) by the State of Illinois to pay the lottery jackpot named the Illinois Department of Revenue as the contractholder and petitioner as the annuitant with the right to receive 19 annual payments of $180,484.50.[1] Under the terms of that contract, Standard Security could not, "prior to the completion of the Contract, suspend, revoke, postpone or terminate any payments under this Annuity Contract to the Contractholder or such person or persons as the Contractholder may from time to time direct for any reason, including but not limited to, the threat of or filing of a suit against it, without the prior written approval of the Contractholder or a court order directing payment to another individual(s)." Further, the State of Illinois guaranteed payment of the prize. The only significant limitation on petitioner's right to the payments is contained in section 13 of the Illinois Lottery Law, which states that he cannot assign that right but further provides:

---

[1]The initial payment of $180,484.50 was paid by the Lottery Division of the State of Illinois apart from this contract.

"[P]ayment of any prize drawn may be paid to the estate of a deceased prize winner, and, except that any person pursuant to an appropriate judicial order may be paid the prize to which the winner is entitled ***." Ill. Rev. Stat. 1987, ch. 120, par. 1163.

Immediately after winning the lottery, both petitioner and respondent quit their respective jobs and jointly began to enjoy the fruit of their good fortune. Upon petitioner's receipt of the first three installments of the jackpot, he first deposited the checks in the parties' joint checking or money market accounts and then he and respondent expended all of the money on items such as vacations, gifts to family members, entertainment and clothes, often falling into debt in the process. Additionally, in 1983, the parties used a portion of the first lottery installment to purchase a 1983 Chevrolet camper, with title placed in their joint names, for $35,000 and to fund a $2,000 individual retirement account (hereinafter IRA). In 1984, they used a portion of that year's lottery installment as a downpayment on a $75,000 house at 4323 Kildare in Matteson for use by petitioner's mother and stepfather. They also purchased $5,000 worth of furniture for that house. At trial, petitioner testified that he had decided to sell the house and had listed it for sale for $74,900. He further stated that there was a $55,000 mortgage on the house. In 1984, the parties also deposited various amounts of money in accounts set up for their daughters and petitioner's godchild but later mutually decided to close out the account for the godchild. In 1985, the parties used a portion of that year's lottery installment to purchase a used 1982 Chrysler automobile for $10,000 and a used truck tractor and semitrailer for $19,000. At the time of trial, they still owned the Chrysler and had a $280 indebtedness on the car. They no longer owned the tractor and trailer, however, because it cost over $40,000 to keep in good repair and petitioner decided to simply turn it over to the party who had loaned him the money to fund these repairs.

In September of 1985, petitioner advised respondent that he wanted a divorce. Thereafter, the parties separated, with respondent taking all the furnishings from their rented marital home and moving to Monticello, Indiana, with their two children.

In October of 1985, petitioner filed his petition for dissolution of marriage, and in December of that year, by agreement, a trial court entered an order directing petitioner to pay $50 a week in child support for his two children. Respondent testified that from the time she left the marital home until the end of 1986 she supported herself and their daughters with money earned working off and on in a se-

ries of low paying jobs, in addition to the $50-a-week child support payments, food stamps and other governmental relief. During this time, she and her daughters lived in a home owned by her brother. Although her brother charged rent for the home, he agreed to await payment from her. At trial, she testified that she owed $4,200 in unpaid rent to her brother. In 1987, she obtained a court order increasing her child support money to $2,000 a month and she then quit her job and went off governmental relief.

Petitioner meanwhile was continuing to spend the lottery money as quickly as he received it. In 1986, petitioner used a portion of that year's lottery installment to purchase a farm in Tennessee for $80,000 (hereinafter the Downell farm). In acquiring that property, he made a cash downpayment of $50,000 and mortgaged the remaining amount. At the time of trial, he still owed $24,000 on that mortgage and was listing the property for sale with a broker for $90,000. Additionally, he borrowed $80,000 from the Farm Bureau Bank to renovate a house that was located on the farm and still owed $69,600 on that loan at the time of trial.

In 1987, petitioner used a portion of that year's lottery installment to purchase another farm in Tennessee for $385,000 (hereinafter the Cooper farm). In acquiring that property, he paid $30,000 as earnest money, used $50,000 of the Downell farm Farm Bureau Bank loan as additional downpayment and obtained a mortgage for the remaining $305,000. At trial, petitioner introduced an appraisal into evidence indicating the value of the Cooper farm to be $378,300. Though he initially testified that he owed $335,000 on the farm, he later stated that the actual amount owed was either $305,000 or $315,000. Though not reflected in the record, petitioner's counsel has argued in his brief that the actual amount owed on the farm was $335,000, and that figure consisted of accrued interest and principal. In 1987, he also borrowed an additional $35,000 from the Farm Bureau Bank to pay for various farm equipment and owed $38,055 (principal and accrued interest) on that loan at the time of trial.

Petitioner further testified that at various times during 1986-87 he purchased three trucks, which the evidence shows had an aggregate value of either $6,035 or $7,735, and livestock for the farms including 120 head of cattle, which the evidence shows was worth $36,000, three horses worth $500, and one jackass worth $700. To finance the purchase of the livestock, petitioner at various times borrowed money from Mr. and Mrs. Williams of Wartrace, Tennessee. At the time of trial, according to petitioner's testimony, he owed the Williams family either $39,000, $42,000, or $49,000. As proof, he

submitted a copy of his promissory note of $39,000 to the Williams family.

At the conclusion of the trial, the court entered its judgment dissolving the parties' marriage and dividing all of the marital property. In dividing the property, the court noted that it considered all of the relevant factors contained in section 503 of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1987, ch. 40, par. 503), including specifically the relative economic circumstances as well as the liabilities of each party, the dissipation by the petitioner of some marital assets during the parties' separation, and the future earning capacity of the parties.

The court's division of property provided for a 50/50 split of the gross amount from the remaining 15 lottery annuity payments, which the court characterized as "marital property." The court further awarded the following property solely to respondent:

    (1) the 1983 Chevrolet camper;

    (2) the 1982 Chrysler automobile;

    (3) the marital home furniture;

    (4) the IRA;

    (5) the proceeds from a life insurance policy with a present cash value of $7,000;

    (6) two-thirds of the proceeds from the sale of a boat which was purchased in 1986 for $10,000; and

    (7) two-thirds of any money obtained from a lawsuit which petitioner had filed seeking to recover $4,825 in unpaid rent from a tenant at 4323 Kildare.

The court also made respondent solely responsible for the $280 indebtedness on the 1982 Chrysler and the outstanding rent indebtedness of $4,200 owed to her brother. The court awarded the following property solely to petitioner:

    (1) the three trucks;

    (2) a 1971 Cadillac;

    (3) the house at 4323 Kildare;

    (4) the furniture at 4323 Kildare;

    (5) one-third of the proceeds from the sale of the boat; and

    (6) one-third of any money obtained from the lawsuit.

Additionally, the trial court directed petitioner to sell the Downell and Cooper farms, the farm equipment, and the livestock and that when "the aforesaid premises and personalty are sold, then Norma is to receive ⅔ of the 'net proceeds' and Findley is to receive ⅓ of the 'net proceeds.'" The court defined "net proceeds" as "those proceeds remaining, if any, from the sale of the aforesaid real estate and

personalty after all the existing loans are paid off, the payment of reasonable attorney's fees, the payment of any brokerage commission which may be incurred, and the payment of any and all ordinary and usual closing costs and prorations."

OPINION

Petitioner contends that the trial court erred when it failed to treat "his" lottery winnings as income rather than marital property subject to division under section 503 of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1987, ch. 40, par. 503) (hereinafter the Act). He argues that the court should have considered the winnings to be his personal income because the Internal Revenue Code (26 U.S.C. §61 (1988)) treats the receipt of lottery payments as income to the recipient. He further argues that although the source of payment of the lottery winnings is an annuity contract, which would normally be considered a marital asset, it should not be deemed a marital asset in the present case because: (1) under the annuity contract, he does not own the contract but "only" has the right to receive income from it, and (2) because it is not assignable.

■ Under the theory advanced by section 503, the property disposition provision of the Act, marriage is a shared enterprise or a partnership. (See *In re Marriage of Smith* (1981), 86 Ill. 2d 518, 529, 427 N.E.2d 1239, 1244.) As one commentator has noted:

"Like a commercial partnership, the parties in a marriage function by sharing duties and by dividing their labor, without which the relationship could not succeed. It is conceded that the relationship cannot successfully operate without the acquisition of some capital. The accumulation of that capital, however, will not occur, especially if children are present, unless the homemaker-spouse contributes a significant part of her energies to the marriage. The services of both are necessary for the continuance of the relationship. '[T]he wife who spends almost all her married life in homemaking and childrearing contributes significantly to the family's economic welfare by making it possible for [the] husband to earn income and amass property during the marriage.' Parties enter into marriage to achieve particular objectives, and, as in a commercial partnership, the degree to which the joint efforts effectuate this purpose provide [*sic*] the basis for determining and assessing property rights upon dissolution. This viewpoint of marriage as a functional partnership underlies the statutory scheme of the Illinois Marriage and Dissolution of Marriage Act." Heyman,

*The Illinois Marriage and Dissolution of Marriage Act: New Solutions to Old Problems*, 12 J. Marshall J. Prac. & Proc. 1, 8 (1978).

■ To foster the principle of marriage as a functional partnership, section 503(b) of the Act creates a broad category of "marital property" by presuming that all property acquired by either spouse after the marriage and before a judgment for dissolution of marriage is marital property, regardless of how title is held. (Ill. Rev. Stat. 1987, ch. 40, par. 503(b).) This presumption may only be overcome by a showing that the property has been acquired through one of the methods specified in section 503(a) of the Act (Ill. Rev. Stat. 1987, ch. 40, par. 503(a)). These methods include:

"(1) property acquired by gift, legacy or descent;

(2) property acquired in exchange for property acquired before the marriage or in exchange for property acquired by gift, legacy or descent;

(3) property acquired by a spouse after a judgment of legal separation;

(4) property excluded by valid agreement of the parties;

(5) any judgment or property obtained by judgment awarded to a spouse from the other spouse;

(6) property acquired before the marriage;

(7) the increase in value of property acquired by a method listed in paragraphs (1) through (6) of this subsection, irrespective of whether the increase results from a contribution of marital property, non-martial property, the personal effort of a spouse, or otherwise, subject to the right of reimbursement provided in subsection (c) of this Section; and

(8) income from property acquired by a method listed in paragraphs (1) though (7) of this subsection if the income is not attributable to the personal effort of a spouse." Ill. Rev. Stat. 1987, ch. 40, par. 503(a).

■ As indicated by the facts of this case, it is uncontroverted that the money used to purchase the winning lottery ticket came from either petitioner's or respondent's earnings, the purchase of the ticket occurred during their marriage, and the irrevocable right to receive the lottery payments was established during the marriage. Under such circumstances, the winnings would be presumed to be marital property under section 503.

Petitioner does not claim that the lottery winnings were acquired by any of the methods specified in section 503(a) so as to overcome this presumption but instead asserts that because lottery winnings

are taxable as income to the recipient in the year received, the winnings should also be considered income for purposes of his dissolution of marriage proceeding. He argues that if the winnings are characterized as income they should not be divided between the parties but, instead, they could be considered in arriving at an award of maintenance to respondent.

In making this assertion, petitioner fails to distinguish between the shared enterprise concept which underlies the concept of marital property and the essentially revenue-gathering purposes of the Internal Revenue Code. The shared enterprise concept reflects the modern day recognition that it takes the joint efforts of the parties to a marriage to acquire property. (Heyman, *The Illinois Marriage and Dissolution of Marriage Act: New Solutions to Old Problems*, 12 J. Marshall J. Prac. & Proc. 1, 7 (1978).) Based on a recognition of that joint effort, the Act presumes that all property acquired during the marriage is marital property. This is true regardless of whether the property is also taxable as income. For example, in *In re Marriage of Harding* (1989), 189 Ill. App. 3d 663, 545 N.E.2d 459, the petitioner argued that the income from a motel investment, which was taxable as income under section 61 of the Internal Revenue Code, should not be considered marital property but rather should be considered his income for purposes of determining temporary maintenance and child support. The *Harding* court rejected that argument, stating: "These proceeds should have been included in the parties' assets and should have been considered by the trial court when it distributed the assets." (189 Ill. App. 3d at 678, 545 N.E.2d at 468.) Similarly, other property, such as pension payments, though taxable as income (26 U.S.C. §61(a)(11) (1988)), also has been treated as marital property when it is available or the right to receive it has been established at the time of dissolution. *In re Marriage of Hunt* (1979), 78 Ill. App. 3d 653, 397 N.E.2d 511.

The fact that the payments are made solely in petitioner's name does not alter their marital property character, for section 503(b) presumes that all property acquired by either spouse is marital property *regardless of how title is held*. Nor does the fact that the vast majority of the lottery payments will not be received until after the entry of the judgment of dissolution of marriage alter the marital property character of the payments. In this regard the lottery installments are much like pension payments to be made in the future. In Illinois, pension rights, whether matured, not matured, vested, or nonvested, are treated as marital property for dissolution purposes. (*In re Marriage of Fairchild* (1982), 110 Ill. App. 3d 470, 473, 442

N.E.2d 557, 559.) The theory behind this treatment is that these rights are valuable rights acquired during the marriage and, although the payments may not be received until after the marriage, they are property divisible as the fruit of the shared enterprise of marriage. (*In re Marriage of Pieper* (1979), 79 Ill. App. 3d 835, 840-42, 398 N.E.2d 868, 871-73.) Similarly, the lottery winnings, the irrevocable right to which was acquired during the marriage, are fruit of the shared enterprise of marriage and should be divided as martial property.

■■ We find no merit to petitioner's argument that since he is not the annuity contract holder, his rights should be thereby treated differently. The significant factor in classifying this annuity contract is not whether petitioner is the named contract holder, but rather that under the terms of the contract he is the party with the irrevocable right to receive the payments. Nor do we find the inability to assign payments to change the characterization of the payments because the right to receive the payments is paramount and any need to assign may be accomplished pursuant to the statutory provision that "any person pursuant to an appropriate judicial order may be paid the prize to which the winner is entitled." Ill. Rev. Stat. 1987, ch. 120, par. 1163.

Petitioner argues that although no Illinois case has expressly ruled that lottery winnings are income to the recipient, two Illinois cases, *In re Marriage of Boyden* (1987), 164 Ill. App. 3d 385, 517 N.E.2d 1144, and *In re Marriage of Parello* (1980), 87 Ill. App. 3d 926, 409 N.E.2d 461, strongly imply that such winnings are income. We find both cases to be readily distinguishable on their facts. Neither the *Boyden* case nor the *Parello* case involved the question of the characterization of lottery winnings, the right to which had accrued during the marriage. In *Boyden,* the court characterized the lottery winnings of a divorced husband, *acquired 10 years after the divorce,* as income for child support modification purpose. (*Boyden,* 164 Ill. App. 3d at 387, 517 N.E.2d at 1146.) In *Parello,* though factually there were no lottery winnings involved in the case, the court noted that "[c]ounsel for petitioner concedes that neither petitioner nor the trial court intended for extraordinary income such as income from a lottery or sweepstakes ticket to be included" in determining the amount of maintenance to be paid *after* the dissolution of marriage. (*Parello,* 87 Ill. App. 3d at 936, 409 N.E.2d at 468.) Thus, both cases dealt with the characterization of lottery winnings acquired *after,* not during, the marriage. Accordingly, neither case can be properly read to imply that lottery winnings, the right to which is acquired during

the dissolution of marriage, should be characterized as income.

Both sides have cited published and unpublished decisions from other jurisdictions to support their respective characterizations of the lottery winnings. Though we are not bound by any of these decisions, we do find the decision of the New York Supreme Court, Appellate Division, in *Ullah v. Ullah* (1990), ___ A.D.2d ___, 555 N.Y.S.2d 834, to be instructive on the issue. The relevant facts in that case are that during the marriage the husband used marital funds to purchase a New York State lottery ticket which won the jackpot of $8 million. Upon winning the lottery, both the husband and wife resigned from their respective jobs and jointly decided the manner in which the first installment of the lottery winnings would be spent. Divorce proceedings were instituted soon thereafter. Though the husband conceded at trial that the lottery prize was joint income, he argued on appeal that the lottery award was his separate property. In construing language similar to that contained in section 503 of the Act, the *Ullah* court stated:

> "Consistent with the legislative intent to treat modern marriages as economic partnerships [citation], clearly the unambiguous, plain meaning of Domestic Relations Law §236(B)(1)(c) mandates that a lottery jackpot, including future payments, the right to which arose during the marriage by virtue of the efforts of one spouse, and upon a wager of marital funds, constitutes marital property subject to equitable distribution [citations]." (___ A.D.2d at ___, 555 N.Y.S.2d at 835.)

The court further noted that an equal split of the lottery prize was a fair distribution of this marital property because

> "in the instant case the contributions each spouse made prior to winning the prize have little relevance to the manner in which the lottery jackpot should be distributed. This award was won through sheer luck, against odds of 12,913,583 to one. As Justice Rigler [trial judge] aptly recognized, this enormous return required 'little effort or investment'. As it was predominately the result of fortuitous circumstances and not the result of either spouse's toil or labor, we find that an equal division of this jackpot was entirely appropriate." ___ A.D.2d at ___, 555 N.Y.S.2d at 835.

■ Similarly, in the present case, the lottery jackpot of $3.6 million, including the right to future payments, was acquired during the marriage through the efforts of one spouse who wagered marital funds. Under the language of section 503 and consistent with its underlying principle, the jackpot should be treated as marital prop-

erty. Furthermore, the record discloses that the parties themselves treated the jackpot as marital property. Though unlike the husband in *Ullah*, petitioner did not ever verbally concede that the lottery award was joint income, it is clear from the conduct of the parties upon winning the lottery that they treated it as joint property. As in *Ullah*, both parties quit their respective jobs and shared in the determination of how the winnings would be spent. Furthermore, it is significant to note that upon receipt of the lottery installments, petitioner first deposited the installments in the parties' joint marital accounts and then the parties used the funds to acquire items some of which were placed in their joint names, such as the camper, or to jointly open accounts, such as the accounts established for their children and petitioner's godchild. Under such circumstances, we find the trial court's characterization of the jackpot as marital property to be correct.

Additionally, as in *Ullah*, we find that an equal division of this asset was appropriate. Regardless of who actually handled the purchase of the winning ticket or who selected the numbers, the actual winning was predominately the result of fortuitous circumstances. Under such circumstances, we cannot say that either party would be entitled to a greater share of the prize. We view this situation as similar to any fortuitous or unfortuitous circumstance which would impact on the value of marital property. Under a shared enterprise or partnership concept of marriage, both parties should share in the consequences.

Petitioner next contends that the trial court abused its discretion in awarding respondent a disproportionate share of the marital property. To a large extent this contention is premised upon the disproportionate division which would result from a characterization of the lottery winnings as income. Since we have affirmed both the trial court's characterization of the winnings as marital property and its even split of the remaining 15 installments of the winnings, the basis for this contention has been largely eliminated. Because the lottery winnings represent such a large portion of the marital property, an even split of those winnings would result in the overall division of the property being close to equal. Nonetheless, we will address petitioner's contention to the extent that it is directed at the division of the nonlottery marital property. Petitioner argues that the court's division of this remaining marital property resulted in an award of 97% of that property to respondent, and only 3% to him.

■■ ■ The Act does not require that marital property be evenly divided between the parties. (*In re Marriage of Hanson* (1988), 170 Ill. App. 3d 298, 303, 524 N.E.2d 695, 698.) The Act merely requires that a trial court divide the marital property in "just proportions"

considering all relevant factors, including:

> "(1) the contribution or dissipation of each party in the acquisition, preservation, or depreciation or appreciation in value, of the marital and non-marital property, including the contribution of a spouse as a homemaker or to the family unit;
>
> (2) the value of property set apart to each spouse;
>
> (3) the duration of the marriage;
>
> (4) the relevant economic circumstances of each spouse when the division of property is to become effective, including the desirability of awarding the family home, or the right to live therein for reasonable periods, to the spouse having custody of the children;
>
> (5) any obligations and rights arising from a prior marriage of either party;
>
> (6) any antenuptial agreement of the parties;
>
> (7) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties;
>
> (8) the custodial provisions for any children;
>
> (9) whether the apportionment is in lieu of or in addition to maintenance;
>
> (10) the reasonable opportunity of each spouse for future acquisition of capital assets and income; and
>
> (11) the tax consequences of the property division upon the respective economic circumstances of the parties." (Ill. Rev. Stat. 1987, ch. 40, par. 503(d).)

Upon review, a trial court's division of marital property will not be reversed absent a showing that the court acted arbitrarily and beyond the bounds of reason. *Szesny v. Szesny* (1990), 197 Ill. App. 3d 966, 971, 557 N.E.2d 222, 225.

As previously noted, the trial court expressly predicated its division of marital property on a consideration of the factors set forth in section 503 of the Act, including the economic circumstances and liabilities of each party, petitioner's dissipation of some marital assets during the parties' separation, and the future earning capacity of the parties. Based on its consideration of these factors, it assigned certain property to each party and directed that the parties share the "net proceeds" on the sale of other property based on a two-thirds respondent—one-third petitioner split. Though the court's division of this property does result in an uneven division between the parties, we find the disparity to be within the bounds of reason in light of the circumstances of this case. Furthermore, we find that when one in-

cludes the share of the lottery winnings each party will receive, any disparity in the division of the other marital property would be insignificant and not such as to make the division unjust.

Initially, we note that based on the evidence presented at trial, the court's division of the remaining marital property did not result in respondent's receiving 97% and petitioner's receiving 3% of that property. Pursuant to the court's division, the respondent was assigned the following property with the following values:

| | | | |
|---|---|---|---|
| (1.) | Marital Home Furnishings | — | Unknown |
| (2.) | 1983 Chevrolet Camper | — | $35,000 |
| (3.) | 1982 Chrysler | — | $10,000 |
| (4.) | IRA | — | $ 2,000 |
| (5.) | Life Insurance Cash Value | — | $ 7,000 |
| (6.) | Two-thirds Sale of Boat Proceeds | — | $ 6,666.67 |
| (7.) | Two-thirds Pending Lawsuit Proceeds | — | $ 3,216.67 |
| | | | $63,883.34 |
| | (Assigned Liabilities) | | - 4,480.00 |
| | | | $59,403.34 |

The petitioner was assigned the following property with the following values:

| | | | |
|---|---|---|---|
| (1.) | 1971 Cadillac | — | Unknown |
| (2.) | 4323 Kildare | — | $19,900 or $20,000 |
| (3.) | Trucks | — | $ 6,035 or $ 7,735 |
| (4.) | 4323 Kildare Furnishings | — | $ 5,000 |
| (5.) | One-third Sale of Boat Proceeds | — | $ 3,333.33 |
| (6.) | One-third Pending Lawsuit Proceeds | — | $ 1,608.33 |
| | | | $35,876.66 or $37,676.66 |

Additionally, respondent was assigned two-thirds and petitioner was assigned one-third of the "net proceeds" from the sale of the Downell and Cooper farms, the farm equipment and the livestock. Though the precise amount of the net proceeds will not be known until all the property is sold, based on the evidence presented at trial, the projected net proceeds would appear to be based on the following figures:

| ITEM | VALUE | | LIABILITIES |
|---|---|---|---|
| (1.) Downell Farm | $80,000 or $90,000 | — | $ 69,600 (loan) |
| | | — | 24,000 (mortgage) |
| | | — | 4,800 or $ 5,400 (6% commission) |

| | | | |
|---|---|---|---|
| (2.) Cooper Farm | 378,300 or 385,000 | — | 305,000 or 315,000 (mortgage) |
| | | — | 22,698 or 23,100 (6% commission) |
| (3.) Farm Equipment | 35,000 | — | 38,055 (loan) |
| (4.) Livestock | 37,200 | — | 39,000 or 42,000 or 49,000 (loan) |

Even assuming that this property would sell at the highest combined value, $547,200, and that the liabilities would be at the lowest possible combined level, $504,155, the projected net proceeds from the sale would be no more than $43,045, which according to the trial court's order would be divided $28,696.67 to the respondent and $14,348.33 to the petitioner. Adding these figures to the figures for the solely assigned property, the parties would receive:

| Respondent | Petitioner |
|---|---|
| $ 59,403.34 | $ 35,876.66 or 37,676.66 |
| +28,696.67 | +14,348.33 |
| $ 88,100.01 | $ 50,224.99 or 52,024.99 |

Respondent's $88,100.01 would represent approximately 63% of the remaining marital property. In light of respondent's lower earning capacity, as evidenced by the fact that she remained out of the work force during most of the marriage and when she reentered the work force she worked at only low paying jobs, and the circumstances under which she lived in 1986, when petitioner had virtually full use of that year's lottery payment, we cannot say that such a division would be beyond the bounds of reason. (See *In re Marriage of Hanson* (1988), 170 Ill. App. 3d 298, 303, 524 N.E.2d 695, 698.) Furthermore, the fact that each party will receive total lottery payments of $1,353,633.70 (gross) makes this disparity insignificant as the overall percentages of marital property received would be approximately 51% for the respondent and 49% for the petitioner.

■12. Petitioner argues that the court's division of marital property would require him to raise additional cash to liquidate his share of the farms, the equipment and the livestock, but we find this argument to be unsupported by the record. The judgment only provides for a sharing of this property after all the existing loans, attorney fees, brokerage commissions and any and all ordinary and unusual closing costs are paid. Thus, both parties will share in the cost of liquidating the property. Moreover, from the record presented to us, it does not appear that there will be a loss from the sale of the property. The record indicates that even assuming the greatest possible liability

and lowest possible sale price supportable by the evidence, $523,153 and $530,500, respectively, the sale of the farms, farm equipment and livestock would generate a gain. Therefore, we need not address the hypothetical question of who would bear the burden of any loss.

For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

COCCIA, P.J., and MURRAY, J., concur.