[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This lawsuit first came to this Court by a complaint dated May 29, 1996 and returnable July 2, 1996 seeking a dissolution of the marriage of the parties, sole custody of the minor child, child support, alimony, an equitable distribution of the marital estate, an allowance to prosecute, CT Page 112 an allocation of debts and an order that the Plaintiff may take the minor child as a tax exemption for IRS purposes.
Accompanying the complaint was a motion for custody and support, alimony, an allowance to prosecute and an allocation of debt pendente lite.
The Court, Hurley, J., on April 7, 1997 entered the following orders incident to said motion.
Pendente lite alimony is awarded in the amount of $230.00 per week, in addition to the $270.00 weekly child support.
Counsel for the parties were present on April 7, 1997.
On July 8, 1996 counsel for the Defendant had appeared solely to contest this Court's exercise of In Personam Jurisdiction.
On August 1, 1996 the Defendant, by counsel, moved to dismiss those portions of the complaint dated May 29, 1996 seeking financial orders on the ground that this Court lacks in personam jurisdiction over the Defendant.
A memorandum of law was filed in support of Defendant's motion.
The Plaintiff objected to the Defendant's motion to dismiss and filed a memorandum of law in support thereof.
A supplemental memorandum of law in support of the motion to dismiss was also filed by the Defendant.
On December 10, 1996 the Court, Hurley, J., filed a memorandum of decision finding that Connecticut General Statutes (C.G.S.) § 46b-46 (b) was not unconstitutional as applied to this case and denied the motion to dismiss.
On July 1, 1997 the Defendant filed an answer to the complaint and eight special defenses.
The answer admitted paragraphs 1, 3 and 4 of the complaint, and as to paragraphs 2 and 5, left the Plaintiff to CT Page 113 her proof.
The Defendant filed the following special defenses:
a. lack of jurisdiction over the defendant
 b. claimed C.G.S. § 46b-46 (b) is unconstitutional as violative of due process under the 14th Amendment of the U.S. Constitution
 c. claimed C.G.S. § 46b-46 (b) is unconstitutional as violative of due process under Article First
Section 8 of the Connecticut Constitution
d. equitable estoppel
e. waiver
f. laches
g. res judicata
h. collateral estoppel.
A motion for contempt dated July 7, 1997 was filed on September 9, 1997 by the Plaintiff, but was not pressed at trial, and the Court considers the motion abandoned.
The matter came on for hearing before the Court on November 12, 1997.
The Plaintiff and her counsel were present.
The Defendant's attorney was present, but theDefendant did not appear.
 The Court makes the following findings of fact.
The Plaintiff, whose maiden name was Roxanna Strickland, and the Defendant were married on April 7, 1979 at New London.
The Plaintiff has resided continuously in this state for twelve months next before the date of the filing of the complaint. CT Page 114
The marriage has broken down irretrievably.
There is one minor child issue of the marriage, Timothy A. Panganiban, born May 23, 1981, now age 16.
The Plaintiff has two children by a prior marriage.
The Defendant has one child by another relationship.
At the time of the marriage the Defendant was not working and was receiving State Welfare Assistance.
The Defendant was out of work during most of the marriage through 1985 when he left Connecticut.
The Plaintiff was unemployed during the period April 1981 to 1985.
At one point, the Defendant had a job as a maintenance worker.
There were episodes of abuse of alcohol and some instances of physical violence on the part of the Defendant toward the Plaintiff.
These problems developed three years into the marriage.
There were two occasions on which the Plaintiff resorted to a women's shelter.
Some of the violence consisted of hair pulling and striking.
The police were called on four occasions by the Plaintiff due to instances of physical violence in 1984.
The Defendant used cocaine.
The Defendant would purchase 20 to 30 lottery tickets each week during the marriage until he left in 1985.
Plaintiff had ten dollars per week spending money. CT Page 115
Plaintiff had no motor vehicle.
Plaintiff received food stamps.
When groceries were purchased, Plaintiff had to summon a cab.
The Defendant left Connecticut in 1985 and traveled to New Jersey to reside with his sister.
At the time the Defendant left Connecticut in 1985, he and the Plaintiff were both living in the same housing complex, but in different units.
During the years 1986 through 1989 the Defendant provided no support to the Plaintiff or the child.
Plaintiff never represented to the Defendant during the period of their separation that she had secured a divorce.
Plaintiff has had several boyfriends during the Defendant's absence.
Plaintiff files her income tax returns in the category of head of household and claims the child as an exemption.
Due to her limited financial circumstances, Plaintiff was unable earlier to file a petition for dissolution or secure the services of counsel.
Plaintiff learned about two years ago that the Defendant had won the Maryland Powerball lottery when a note was left at the child's school, wherein the Defendant requested the Plaintiff contact him.
On or about September 18, 1993, the Defendant held one of two winning tickets in the Powerball lottery, which ticket was selected and designated as a winning number by the appropriate lottery official in Maryland.
The grand prize money was to be evenly divided between the owners of the winning tickets. The total grand prize was $32,000,000.00 and the Defendant's share was one-half thereof, or $16,000,000.00, to be paid out in 20 equal CT Page 116 consecutive annual installments. (See Defendant's Exhibit 1.)
Plaintiff has the Defendant's telephone number, but has never called him.
Plaintiff's last place of employment was a part-time position at the Thames Club in New London as a waitress.
Prior employment was at Friendly's Restaurant.
Plaintiff did not graduate from high school.
Plaintiff has no health insurance, suffers on occasion from back pain and foot problems and has had a hysterectomy.
Plaintiff has applied for a position at the Foxwoods Casino to be a beverage server.
Defendant hasn't contacted his son since 1986.
The minor child needs dental work.
Plaintiff currently receives $1,000.00 per month support for the minor child. See Defendant's Exhibit 4, Consent Order from the Circuit Court for Wicomico, Maryland. This support commenced April 18, 1996.
The decision to file a petition for dissolution of marriage came about when several of Plaintiff's co-workers at Friendly's suggested she do so.
While the Plaintiff and Defendant resided together, the Plaintiff would object when the Defendant spent money on lottery tickets.
Plaintiff is age 38.
While at the Thames Club, the Plaintiff's earnings were $149.00 weekly.
The Defendant is age 48 and his education extended through three years of high school. See the health form.
The Plaintiff is currently receiving unemployment CT Page 117 compensation of $83.00 weekly. See Defendant's Exhibit 2.
Plaintiff has no assets of any consequence and owes Lawrence and Memorial Hospital $7,000.00. See Defendant's Exhibit 2.
From the Defendant's financial affidavit, the Court notes the following:
That the Defendant is retired.
That the Defendant receives a distribution from the Maryland Lottery of $800,000.00 per year, which on a monthly basis breaks down to: $66,666.67.
Interest income $ 7,098.52 annually ($591.55 monthly)
Less Federal tax $24,715.39
Less Maryland tax $ 5,391.97
Net Monthly $37,150.86
Claimed Living Expenses $21,233.81 monthly
Defendant has:
Limited liabilities with recognition of the Defendant being a Defendant in Maryland in claims by his sister and sister's husband for a share in the Powerball winnings.
Defendant's equity in a residence in Salisbury, Maryland valued at $450,000.00 is $87,832.00.
Defendant's savings accounts, $100,400.00; checking account, $98,000.00. Other assets, $50,000.00.
The Plaintiff's financial affidavit reflects that she is unemployed and receives $231.00 weekly support for the child.
Plaintiff's weekly expenses are $316.00.
Plaintiff owes debts totaling $7,600.00.
Plaintiff's only assets are furniture and CT Page 118 furnishings valued at $1,000.00 and $400.00 in the bank.
The Defendant herein is the Defendant in a certain civil suit pending in the Circuit Court for Wicomico County, state of Maryland entitled Ann Elizabeth Fanugao and Gene A.Fanugao vs. Alan S. Panganiban, Civil Case No. 96 CV 386, which suit seeks money damages and declaratory judgments concerning claims of the Maryland Plaintiff's incident to an alleged agreement concerning the Powerball ticket and the winnings incident thereto. See Defendant's Exhibit 1.
This suit contains ten counts and an amendment thereto.
The ten counts require 29 pages to set forth the claims and the amendment another 16 pages in length.
As best this Court can divine, this suit is pending in Maryland to be heard by a jury in due course.
THE LAW
"The power to act equitably is the keystone to the court's ability to fashion relief in the infinite variety of circumstances which arise out of the dissolution of a marriage. Without this wide discretion and broad equitable power, the courts in some cases might be unable fairly to resolve the parties' dispute. . . ." Pasquariello v.Pasquariello, 168 Conn. 579, 585 (1975).
Alimony (C.G.S. § 46b-82)
In lieu of or in addition to assignments under C.G.S. § 46b-81, the court may order periodic alimony to either party. C.G.S. § 46b-82. The purpose of alimony is "not to punish the guilty, but to continue the duty of support to one legally abandoned." Tobey v. Tobey, 165 Conn. 742, 748
(1974).
In ordering alimony, the court shall be guided by the factors enumerated in C.G.S. § 46b-82:
(a) the length of the marriage;
(b) the causes of the annulment, dissolution, or CT Page 119 separation;
 (c) the age, health, station, occupation, amount and sources of income, employability, estate, and needs of each of the parties;
 (d) the award, if any, of property which the court may make, pursuant to C.G.S. § 46b-81; and
 (e) the desirability of the parent awarded custody of the minor children securing employment.
Leo v. Leo, 197 Conn. 1, 5 (1985). In determining alimony under C.G.S. § 46b-82, therefore, the court must weigh the station or standard of living of the parties in light of the above statutory factors. Blake v. Blake, 207 Conn. 217, 232
(1988).
Similarly, in determining the assignment of marital property pursuant to C.G.S. § 46b-81, the trial court must weigh the station or standard of living of the parties in light of the other statutory factors. Blake v. Blake,207 Conn. 217, 232 (1988).
From Blake v. Blake, 207 Conn. 217 at page 231:
 We need not decide whether "the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates" includes non-monetary contributions. Sections 46b-81 (c), 46b-82 and 46b-84 (b) all require that the trial court consider the "station" of each spouse. The most pertinent definition of "station" in Webster, Third New International Dictionary, is "social standing." A person's social standing is strongly correlated to his standard of living, although other factors may be important as well. Our courts have frequently considered the standard of living enjoyed by spouses in determining alimony or in dividing marital property. Whitney v. Whitney, 171 Conn. 23, 27-29, 368 A.2d 96
(1976); Tobey v. Tobey, 165 Conn. 742, 747-49, 345 A.2d 21 (1974); Stoner v. Stoner, 163 Conn. 345, 350, 307 A.2d 146 (1972); Morris v. Morris, 132 Conn. 188, 191-94, 43 A.2d 463 (1945). "We cannot CT Page 120 hold that the trial court, taking into consideration as it did the financial circumstances and standard of living of the parties, abused its discretion in ordering payments in the amount stated. In determining the assignment of marital property under § 46b-81
or alimony under § 46b-82, a trial court must weigh the "station" or standard of living of the parties in light of other statutory factors such as the length of the marriage, employability, liability and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income.
 Taking the Defendant's Special Defenses in order,the Court makes the following observations and sets forthcertain legal definitions and case authority therefore.
 As to the First Special Defense claiming lack ofpersonal jurisdiction:
The Court adopts and embraces the memorandum of decision authored by Hurley, J., dated December 10, 1996 as to the issue of in personam jurisdiction and the constitutionality of C.G.S. § 46b-46 (b).
In particular, the Court notes the following from that decision on page 6 thereof.
 The defendant chose to leave the state, abandoning his family who continued to be supported by the taxpayers of this state. It is disingenuous of the defendant who has now become wealthy to claim it would "offend all notions of fair play and substantial justice" for this court to exercise personal jurisdiction over him.
 The defendant purposefully availed himself of the benefits of this state by obtaining a marriage license here, enrolling his child in public school and most significantly relying on this state to support his wife and child after he left the forum.
 As to the Second Special Defense claiming violationof due process as to the 14th Amendment to theU.S. Constitution.
Due process clause protects an individual's liberty in CT Page 121 not being subject to the binding judgments of a forum with which he has established no meaningful contacts, ties, or relations; although the protection operates to restrict state power, it is ultimately a function of the individual liberty interest preserved by the due process clause rather than a function of federalism concern. U.S.C.A. Const. Amend. 14.
 State generally has a manifest interest in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors and, where those individuals purposefully derive benefit from their interstate activities, it may be unfair to allow them to escape having to account in other states for the consequences that arise proximately from such activities and, for those reasons, forum may legitimately exercise personal jurisdiction over a non-resident who purposefully directs activities toward forum residents.
 So long as it creates a substantial connection with the forum, even a single act can support jurisdiction.
 Constitutional touchstone in long-arm jurisdiction cases is whether the defendant purposefully established minimum contacts in the forum state.
See Burger King Corp. v. Rudzewicz, 471 U.S. 462.
 The Due Process Clause of the Fourteenth Amendment operates to limit the power of a State to assert in personam jurisdiction over a nonresident defendant, Pennoyer v. Neff, 95 U.S. 714, 24 L.Ed. 565 (1878). Due process requirements are satisfied when in personam jurisdiction is asserted over a nonresident corporate defendant that has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend `traditional notions of fair play and substantial justice.'" International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945), quoting Miliken v. Meyer, 311 U.S. 457, 463, 61 S.Ct. 339, 342, 85 L.Ed. 278
(1940). When a controversy is related to or "arises out of" a defendant's contacts with the forum, the Court has said that a "relationship among the defendant, the CT Page 122 forum, and the litigation" is the essential foundation of in personam jurisdiction. Shaffer v. Heitner, 433 U.S. 186, 204, 97 S.Ct. 2569, 2579, 53 L.Ed.2d 683
(197).
See Helicopteros Nacionales de Colombia v. Hal, 466 U.S. 413.
 Jurisdictional inquiry under long-arm statute and Fourteenth Amendment focuses on relations among defendant, forum and litigation, and plaintiff's residence may well play important role in determining propriety of entertaining suit against nonresident defendant in the forum, but lack of residence on the part of the plaintiff would not defeat jurisdiction established on basis of defendant's contacts. U.S.C.A. Const. Amend. 14.
See Keeton vs. Hustler Magazine Inc., 465 U.S. 770.
 Protections of substantive due process are for most part accorded to matters relating to marriage, family, procreation and right to bodily integrity. (Per Chief Justice Rehnquist, with three Justices joining, two Justices concurring and two Justices concurring in judgment.) U.S.C.A. Const. Amend. 14.
See Albright v. Oliver, 114 S.Ct. 807.
As to the Third Special Defense claiming violationof the due process clause in Article First Section 8 of theConnecticut Constitution.
 Due process analysis requires a fact-based balancing of the importance of the individual's interests against the needs of society to infringe upon those interests. Due process analysis has not been reduced to any formula; its content cannot be determined by reference to any code . . .
See State vs. Floyd, 217 Conn. 73.
 In determining the scope of our state constitution's due process clauses, we have taken as a point of departure those constitutional or quasi-constitutional rights that were recognized at common law in this CT Page 123 state prior to 1818.
See State vs. Ross, 230 Conn. 183.
 Borrowing from the federal constitutional standard enunciated by the United States Supreme Court in Mathews v. Eldridge, 424 U.S. 319, 334-35, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), we have held that due process under the Connecticut constitution requires us to "consider three factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." (Internal quotation marks omitted.) Chmielewski v. Aetna Casualty Surety Co., 218 Conn. 646, 662, 591 A.2d 101 (1991) (article first, § 10); State v. Lamme, 216 Conn. 172, 178, 579 A.2d 484 (1990) (article first, § 9); Kinsella v. Jaekle, 192 Conn. 704, 730, 475 A.2d 243
(1984) (article first, §§ 8, 9, 10); see Chmielewski v. Aetna Casualty Surety Co., supra, 656 n. 12, 661 n. 17.
See State vs. Morales, 232 Conn. 707.
 "Once it is determined that due process applies, the question remains what process is due. It has been said so often . . . as not to require citation of authority that due process is flexible and calls for such procedural protections as the particular situation demands . . . Its flexibility is in its scope once it has been determined that some process is due; it is a recognition that not all situations calling for procedural safeguards call for the same kind of procedure." Morrissey v. Brewer, 408 U.S. 471, 481, [92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)]. CT Page 124
See State vs. Patterson, 37 Conn. App. 801.
As to the Fourth Special Defense claiming equitableestoppel:
 Equitable estoppel. The doctrine by which a person may be precluded by his act or conduct, or silence when it is his duty to speak, from asserting a right which he otherwise would have had. Mitchell v. McIntee, 15 Or. App. 85, 514 P.2d 1357, 1359. The effect of voluntary conduct of a party whereby he is precluded from asserting rights against another who has justifiably relied upon such conduct and changed his position so that he will suffer injury if the former is allowed to repudiate the conduct. American Bank Trust Co. v. Trinity Universal Ins. Co., 251 La. 445, 205 So.2d 35, 40.
 Elements or essentials of such estoppel include change of position for the worse by party asserting estoppel, Malone v. Republic Nat. Bank Trust Co., Tex. Civ. App., 70 S.W.2d 809, 812; conduct by party estopped such that it would be contrary to equity and good conscience for him to allege and prove the truth, Rody v. Doyle, 181 Md. 195, 29 A.2d 290, 293; false representation or concealment of facts, Clark v. National Aid Life Ass'n, 177 Okla. 137, 57 P.2d 832, 833; ignorance of party asserting estoppel of facts and absence of opportunity to ascertain them, Fipps v. Stidham, 174 Okla. 473, 50 P.2d 680, 684; injury from declarations, acts, or omissions of party were he permitted to gainsay their truth, Fleishbein v. Western Auto Supply Agency, 19 Cal.App.2d 424, 65 P.2d 928; intention that representation should be acted on, Consolidated Cut Stone Co. v. Seidenbach, 181 Okla. 578, 75 P.2d 442, 452; knowledge, actual or constructive, of facts by party estopped, Antrim Lumber Co. v. Wagner, 175 Okla. 564, 54 P.2d 173, 176; Lillywhite v. Coleman, 46 Ariz. 523, 52 P.2d 1157, 1160; misleading person to his prejudice, United States. for Use and Benefit of Noland Co. v. Wood; C.C.A. Va., 99 F.2d 80, 82; omission, misconduct or misrepresentation misleading another. It is based on some affirmative action, by word or conduct, of the person against whom it is invoked, and some action of the other party, relying on the representations made. CT Page 125 George W. Armbruster, Jr. Inc. v. City of Wildwood D.C.N.J., 41 F.2d 823, 829.
Blacks Law Dictionary, 6th Edition.
As to the Fifth Special Defense claiming waiver:
 Waiver. The intentional or voluntary relinquishment of a known right, or such conduct as warrants an inference of the relinquishment of such right, or when one dispenses with the performance of something he is entitled to exact or when one in possession of any right, whether conferred by law or by contract, with full knowledge of the material facts, does or forbears to do something the doing of which or the failure of forbearance to do which is inconsistent with the right, or his intention to rely upon it. The renunciation, repudiation, abandonment or surrender of some claim, right, privilege, or of the opportunity to take advantage of some defect, irregularity, or wrong. An express or implied relinquishment of a legal right. A doctrine resting upon an equitable principle, which courts of law will recognize. Atlas Life Ins. Co. v. Schrimsher, 179 Okla. 643, 66 P.2d 944, 948.
 Waiver is essentially unilateral, resulting as legal consequence from some act or conduct of party against whom it operates, and no act of party in whose favor it is made is necessary to complete it. Coleman Production Credit Ass'n v. Mahan, Tex. Civ. App. 168 S.W.2d 903, 904. And may be shown by acts and conduct and sometimes by nonaction. Concrete Engineering Co. v. Grande Bldg. Co., 230 Mo. App. 443, 86 S.W.2d 595, 608.
 The term is often used in the context of waiving one's right to counsel (for example, Miranda warning) or waiving certain steps in the criminal justice process (for example, the preliminary hearing). Essential to waiver is the voluntary consent of the individual. See e.g. Fed.R.Crim.P. 44 (a).
 Terms "estoppel" and "waiver" are not synonymous; "waiver" means the voluntary, intentional relinquishment of a known right, and "estoppel" rests upon principle CT Page 126 that, where anyone has done an act, or made a statement, which would be a fraud on his part to controvert or impair, because other party has acted upon it in belief that what was done or said was true, conscience and honest dealing require that he not be permitted to repudiate his act or gainsay his statement. Peloso v. Hartford Fire Ins. Co., 102 N.J. Super. 357, 246 A.2d 52.
Blacks Law Dictionary, 6th Edition.
As to the Sixth Special Defense invoking laches:
 The defense of laches has application only when there is established unreasonable, inexcusable, and prejudicial delay in bringing suit. See Cummings v. Tripp, 204 Conn. 67, 88, 527 A.2d 230 (1987). The defense is comprised of two elements: (1) a delay that was inexcusable, and (2) a delay that prejudiced the defendant. See Berin v. Olson, 183 Conn. 337, 344, 439 A.2d 357 (1981); Danaher v. C.N. Flagg Co., 181 Conn. 101, 107, 434 A.2d 944 (1980); Kurzatkowski v. Kurzatkowski, 142 Conn. 680, 685, 116 A.2d 906
(1955). The burden is on the party alleging laches to establish the defense. See Cummings v. Tripp, supra, 204 Conn. 88. Whether a plaintiff has been guilty of laches is an issue of fact for the trier, which cannot be made by an appellate court unless the subordinate facts found make such a conclusion inevitable as a matter of law. See Farmers Mechanics Savings Bank v. Sullivan, 216 Conn. 341, 350, 579 A.2d 1054 (1990); Kurzatkowski v. Kurzatkowski, supra, 684.
Castonquay vs. Plourde, 46 Conn. App. 251. See also FederalDeposit Ins. Co. v. Voll, 38 Conn. App. 198.
As to the Seventh Special Defense invoking resjudicata and the Eighth Special Defense invoking collateralestoppel:
 "Because res judicata or collateral estoppel, when properly raised and established, will preclude a claim or issue, respectively, the defendant's invocation of this principle must first be resolved. We have recently had an opportunity to address these CT Page 127 two doctrines, their similarities and their differences.
 Jackson v. R.G. Whipple, Inc., 225 Conn. 705, 712-13, 627 A.2d 374 (1993), and cases cited therein. Claim preclusion (res judicata) and issue preclusion (collateral estoppel) have been described as related ideas on a continuum. [C]laim preclusion prevents a litigant from reasserting a claim that has already been decided on the merits. . . . [I]ssue preclusion, prevents a party from relitigating an issue that has been determined in a prior suit. Virgo v. Lyons, 209 Conn. 497, 501, 551 A.2d 1243 (1988), quoting Gionfriddo v. Gartenhaus Café , 15 Conn. App. 392, 401-402, 546 A.2d 284 (1988), aff'd, 211 Conn. 67, 557 A.2d 540 (1989)." (Internal quotation marks omitted.) Crochiere v. Board of Education, 227 Conn. 333, 342-43, 630 A.2d 1027 (1993).
 The two doctrines "protect the finality of judicial determinations, conserve the time of the court and prevent wasteful relitigation." (Internal quotation marks omitted.) Virgo v. Lyons, supra, 209 Conn. 501. "Res judicata, or claim preclusion, is distinguishable from collateral estoppel, or issue preclusion. Under the doctrine of res judicata, a final judgment, when rendered on the merits, is an absolute bar to a subsequent action, between the same parties or those in privity with them, upon the same claim. Slattery v. Maykut, 176 Conn. 147, 156-57, 405 A.2d 76 (1978). In contrast, collateral estoppel precludes a party from relitigating issues and facts actually and necessarily determined in an earlier proceeding between the same parties or those in privity with them upon a different claim. DeLaurentis v. New Haven, 220 Conn. 225, 239, 597 A.2d 807 (1991)." Weiss v. Statewide Grievance Committee, 227 Conn. 802, 818, 633 A.2d 282
(1993). Furthermore, "[t]o invoke collateral estoppel the issues sought to be litigated in the new proceeding must be identical to those considered in the prior proceeding. Aetna Casualty Surety Co. v. Jones, 220 Conn. 285, 297, 596 A.2d 414 (1991)." Crochiere v. Board of Education, supra, 227 Conn. 345. Both issue and claim preclusion "express no more than the fundamental principle that once a matter has been fully CT Page 128 and fairly litigated, and finally decided, it comes to rest." State v. Ellis, 197 Conn. 436, 465, 497 A.2d 974 (1985).
See Mazziotte vs. Allstate Ins. Co., 240 Conn. 799.
As to the Issue of Full Faith and Credit, U.S. Constitution Article IV, sec 1, as it relates to Defendant's exhibit 4 the Consent Order in the Circuit Court for Wicomico County, State of Maryland, the Court observes Sachs v. Sachs,22 Conn. App. 410 (1990), 578 A.2d 649:
 When either of the parties to a dissolution action meets the domicile requirements of 46b-44 (c), the court has both personal and subject matter jurisdiction and there is a sufficient nexus between the state and the marriage to entitle the court's judgment to full faith and credit. LaBow v. LaBow, 171 Conn. 433, 437, 370 A.2d 990 (1976).
Mirabel v. Mirabel, 30 Conn. App. 821 (1993) 622 A.2d 1037.
 Under the full faith and credit clause United States constitution, art. IV, § 1, the judicial proceedings of a state must be given full faith and credit in every other state. The judgment rendered in one state is entitled to full faith and credit only if it is a final judgment, not subject to modification in the state in which it was rendered. Krueger v. Krueger, 179 Conn. 488, 490, 427 A.2d 400 (1980). The full faith and credit clause does not automatically transform a foreign judgment to constitute a valid judgment, it must be made a judgment in this state. Cahn v. Cahn, 26 Conn. App. 720, 730, 603 A.2d 759, cert. granted, 221 Conn. 924, 608 A.2d 688 (1992).
As to the manner in which the Court should consider the fairest and most equitable apportionment or distribution of lottery winnings, the Court has considered the following cases.
From In re Marriage of Mahafley, 564 N.E.2d 1300
(Ill.App. 1 Dist. 1990):
The fact that the payments are made solely in CT Page 129 petitioner's name does not alter their marital property character, for section 503 (b) presumes that all property acquired by either spouse is marital property regardless of how title is held. Nor does the fact that the vast majority of the lottery payments will not be received until after the entry of the judgment of dissolution of marriage alter the marital property character of the payments. In this regard the lottery installments are much like pension payments to be made in the future. In Illinois, pension rights, whether matured, not matured, vested, or nonvested, are treated as marital property for dissolution purposes. (In re Marriage of Fairchild (1982), 110 Ill. App.3d 470, 473, 66 Ill. Dec. 131, 133, 442 N.E.2d 557, 559.) The theory behind this treatment is that these rights are valuable rights acquired during the marriage and, although the payments may not be received until after the marriage, they are property divisible as the fruit of the shared enterprise of marriage. (In re Marriage of Pieper (1979), 79 Ill. App.3d 835, 840-42, 34 Ill. Dec. 877, 880-82, 398 N.E.2d 868, 871-73.) Similarly, the lottery winnings, the irrevocable right to which was acquired during the marriage, are fruit of the shared enterprise of marriage and should be divided as marital property.
From In re Marriage of Morris, 640 N.E.2d 344
(Ill.App. 2 Dist. 1994)"
 Since it is uncontroverted that the money for the lottery ticket came from petitioner at a time when he was still married and the irrevocable right to receive the lottery payments was established during the marriage, the winnings are presumed to be marital property under section 503. (Mahaffey, 206 Ill. App.3d at 867, 151 Ill. Dec. 638, 564 N.E.2d 1300.) The fact that the payments are made solely in petitioner's name and that the majority of the lottery payments would not be received until after entry of the judgment of dissolution of marriage does not change the fact that the winnings are marital property. (Mahaffey, 206 Ill. App.3d at 868, 151 Ill. Dec. 638, 564 N.E.2d 1300.) Moreover, it is not particularly important who actually bought the CT Page 130 winning ticket since there was little effort or investment, but there was a large payout as a result of a fortuitous circumstance. Mahaffey, 206 Ill. App. 3
d at 871, 151 Ill. Dec. 638, 564 N.E.2d 1300.
 In determining how to divide the property in just proportions, the trial court is to consider all relevant factors, including:
 (1) the contribution of each party to the acquisition, preservation, or increase or decrease in value of the marital or nonmarital property, including the contribution of a spouse as a homemaker or to the family unit;
 (2) the dissipation by each party of the marital or non-marital property;
(3) the value of the property assigned to each spouse;
(4) the duration of the marriage;
 (5) the relevant economic circumstances of each spouse when the division of property is to become effective, including the desirability of awarding the family home, or the right to live therein for reasonable periods, to the spouse having custody of the children;
 (6) any obligations and rights arising from a prior marriage of either party;
(7) any antenuptial agreement of the parties;
 (8) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties;
(9) the custodial provisions for any children;
 (10) whether the apportionment is in lieu of or in addition to maintenance;
 (11) the reasonable opportunity of each spouse for future acquisition of capital assets and income; and CT Page 131
 (12) the tax consequences of the property division upon the respective economic circumstances of the parties." (750 ILCS 5/503 (d) (West 1992).)
 Obviously, under the unusual circumstances of this case some of these factors will have little applicability. Nevertheless, some of these factors do apply and would require some apportionment of the lottery proceeds. As to the fourth factor, the duration of the marriage, the trial court must take into account that the couple was married in excess of 20 years. To recognize only the two years that the couple lived together, as the trial court did in apportioning the pension and denying apportionment of the lottery proceeds, is to view the physical separation as a "common law divorce." As we have already stated, this is not permissible.
From DeVane vs. DeVane, 655 A.2d 970
(N.J.Super.A.D. 1995):
 Two distinct rules have emerged concerning the manner in which lottery winnings should be disbursed between the parties on the dissolution of the marriage and distribution of marital assets. One rule, represented by Ullah, emphasizes that the asset is a windfall and was not created due to the efforts of either party; therefore, it should be divided equally. Ullah. supra, 161 App. Div.2d 699, 555 N.Y.S.2d at 835. Accord Smith v. Smith, 162 App. Div.2d 346, 557 N.Y.S.2d 22
(1990), app. denied, 77 N.Y.2d 805, 568 N.Y.S.2d 913, 571 N.E.2d 83 (1990); In re Marriage of Mahaffey, 206 Ill. App.3d 859, 151 Ill. Dec. 638, 564 N.E.2d 1300
(1990). The other rule is represented by Alston v. Alston, 331 Md. 496, 629 A.2d 70, 72 (1993), which holds that the court should apply the factors guiding equitable distribution of all other assets to arrive at an appropriate distribution decision. Accord Holliday v. Holliday, 651 A.2d 12 (N.H. 1994); In re Marriage of Swartz, 512 N.W.2d 825 (Iowa App. 1993). See also Gibbons v. Gibbons,. 174 N.J. Super. 107, 116, 415 A.2d 1174 (App.Div. 1980) (lottery winnings treated no differently than other unearned income), rev'd on other grounds, 86 N.J. 515, 432 A.2d 80 (1981). Placing primary emphasis on the factor which requires the court to consider how and when the asset was acquired, the Maryland CT Page 132 Court of Appeals in Alston held that the wife was not entitled to any portion of the lottery winnings. The Alston Court emphasized that the parties had been separated many years and that the husband acquired the lottery ticket wholly through his own effort without any contribution or encouragement from his wife. Furthermore, he won the lottery after the complaint for divorce had been filed.
DISCUSSION
This is a marriage of 18 years; however, the parties have been separated for the last 12 years and even before that, there were periods of time when the parties lived apart.
The one child issue of the marriage is now 16.
The Defendant, at least while in Connecticut, was usually unemployed and the Plaintiff's earnings were marginal at best.
It was represented to the Court at trial that no records could be located concerning welfare assistance to the parties via the City of New London welfare rolls.
The education of the parties is limited.
As noted in the findings, while the Defendant was represented by counsel during the proceedings, the Defendant himself saw fit not to attend.
At the conclusion of trial, Plaintiff's counsel submitted two proposed orders only.
The Court was advised that the issues as to custody and support of the minor child were resolved by virtue of a civil action filed in Maryland entitled State of Maryland,Wicomico County for State of Connecticut/Roxanna Panganibanvs. Alan Scott Panganiban, No. 96 CV 1139 in the Circuit Court for Wicomico County State of Maryland.
The Consent Order is set forth herein.
"CONSENT ORDER CT Page 133
WHEREAS, the Plaintiff has filed a Complaint for support through her attorney, KENNETH D. L. GAUDREAU, in this case; and
WHEREAS, the parties wish to consent to the passing of this Order as reflected by their respective signatures;
NOW THEREFORE, it is this 19th day of July, 1996, by the Circuit Court for Wicomico County, Maryland;
ORDERED, as follows:
1. That the Defendant shall pay support in the amount of One Thousand Dollars ($1,000.00) per month for one (1) child, commencing April 18, 1996.
2. That the Defendant agrees that he shall continue to pay child support in the amount of $1,000.00 per month for the minor child until such child reaches the age of 18, unless said child is attending, as a full-time student, a college, university, or vocational school leading to a degree, in which case the Defendant agrees to continue the payment of $1,000.00 per month until the child is no longer a full-time student as previously indicated or until the child reaches the age twenty-two (22), whichever shall first occur.
3. That the Defendant shall pay said support through the Wicomico County Bureau of Support Enforcement; Wicomico County Department of Social Services, P.O. Box 3216, District Court Multi Service Center, 201 Baptist Street, Salisbury, Maryland 21802-3216.
4. That the Defendant shall provide health and hospitalization insurance for the benefit of the minor child and shall provide the Wicomico County Bureau of Support Enforcement with evidence of said coverage within thirty (30) days of the passage of this Order, for forwarding to the Plaintiff. Defendant's obligation regarding health insurance for the minor child terminates upon the child's arrival at age eighteen (18).
5. That the Defendant is required to notify the Wicomico County Bureau of Support Enforcement within ten (10) days of any change of address or employment as long as this Order is in effect. Failure to do so could subject him to a CT Page 134 penalty not to exceed Two Hundred Fifty Dollars ($250.00).
6. That the costs of these proceedings shall be waived."
The proposed orders submitted to the Court were:
A. A request that the Court order the Defendant to pay to the Plaintiff alimony in the amount of $100,000.00 per year for a period of twelve years by an execution on Defendant's Powerball earnings and,
B. a request that the Defendant shall maintain life insurance in the amount of $200,000.00 with the parties' minor child as the sole irrevocable beneficiary until the child reaches age 18. See Defendant's Exhibit 4.
As to the various Special Defenses, the Court observes that throughout the trial the Defendant had an able advocate to represent him, there were a multitude of threads connecting him to Connecticut, which sustain the proposition of in personam jurisdiction and he has been accorded due process.
A balancing of the facts vis-á-vis the Defendant's interests against the needs of society (Connecticut) allow for no other conclusion.
The Plaintiff has engaged in no conscious course of action which has misled or prejudiced the Defendant.
Admittedly, the Plaintiff has dated several men but there is no evidence to suggest that she lulled the Defendant into a state of believing that the parties were divorced.
Plaintiff has not waived any of her rights, as best the Court can divine based on the evidence.
While admittedly a long time has elapsed since the Defendant left Connecticut, the Plaintiff cannot be said to have been guilty of laches in that she was unaware of his whereabouts for a long time and had no funds or assets of any consequence to use in pursuing the Defendant.
Res judicata and collateral estoppel do not seem CT Page 135 applicable in the present circumstances.
In the brief filed by the Defendant, by his counsel, the following is noted, "It has often been said that abandonment is a poor man's divorce, meaning that people of modest means are not interested in and lack the resources to pursue all of the legal niceties of a full-fledged legal dissolution of marriage."
Society however, cannot condone abandonment as divorce; the rules of society require that the State has a proper interest in a matter of such social magnitude.
Admittedly, the eventual outcome of the Maryland proceedings may have a profound effect on the Defendant's circumstances but for the Court to consider that litigation now would amount to conjecture and surmise.
The Defendant cannot be treated as someone who never had any contacts with this State, it is not analogous to a situation involving someone who was never here.
Admittedly, the Defendant did not do commercial business here nor did he for years have a motor vehicle operator's license nor did he vote here.
Defendant was, however, as was his wife and child, on public welfare assistance.
Defendant, by his counsel, concedes that the Plaintiff has satisfied the technical provisions of 46b46 (b). Defendant's position flies in the face of the legal relationship of the parties as husband and wife; this is not creditor and debtor nor mortgagor and mortgagee nor a commercial contract proceeding.
One might have reasonably conjected that after Dame Fortune had smiled so broadly on the Defendant in Maryland that he would have voluntarily at least taken a course of action to improve the circumstances of his son out of motives of love and affection, but alas, it required a proceeding under the Uniform Reciprocal Enforcement of Support Act to secure some measure of support.
There is no comparison between the parties as CT Page 136 concerns the standard of living.
One is poverty, the other affluence.
Defendant's counsel, after directing the Court's attention to all the foregoing issues to wit, constitutionality, estoppel, laches, waiver, etc., takes the position that even if the Court should be able to overcome those hurdles on a proper foundation that under the criteria of § 46b82 Connecticut General Statutes and the Appellate Court's holding in Papageorge vs. Papageorge,12 Conn. App. 596, that no alimony should be awarded.
The Court observes that in many respects Papageorge
is distinguishable from this proceeding.
From Papageorge at page 598 the Court notes:
 After hearing all the evidence, the trial court awarded the defendant the following: periodic alimony of $300 per week, such payments to be secured by a non-negotiable mortgage note on two of the plaintiff's properties; a lump sum alimony payment of $15,000; a $5000 cash payment to defray the costs of the Defendant's attorney's fees; payment of the Defendant's medical expenses which exceed $1000 per calendar year until the defendant becomes eligible for medicare; the naming and maintenance of the defendant as the primary beneficiary of the plaintiff's $100,000 life insurance policy; and the family home, 84 Sherman Court, deeded free and clear of all encumbrances.
The value of the premises at 84 Sherman Court is reflected on page 599 and is $250,000.00.
The Defendant would have the Court award no alimony to the Plaintiff on the Papageorge rationale.
The Court cannot accede to that position.
ORDERS
The Court enters the following orders. CT Page 137
The marriage is dissolved on the ground of irretrievable breakdown and the parties are declared to be single and unmarried.
Sole custody of the minor child, Timothy A. Panganiban, to be with the Plaintiff mother. Reasonable rights of visitation to the Defendant.
Support for the minor child shall continue in accordance with the Maryland order in the amount of $1,000.00 per month.
The Defendant shall maintain life insurance in the amount of $200,000.00 with the minor child, Timothy Panganiban, being the sole irrevocable beneficiary until the child reaches age 18.
The Plaintiff shall be entitled to take the minor child Timothy as an exemption for income tax purposes.
Although there was no evidence introduced as to the nature of Plaintiff's two debts shown on her financial affidavit, the Court proceeds on the premise that the debts fall into the category of necessities and orders that the Defendant shall pay and be responsible for one-half thereof, to wit $3,800.00.
There are no physical assets, such as real estate of the Defendant, situated in Connecticut of which the Court has any knowledge.
At time of trial no specific request by Plaintiff's counsel was made as to an allowance to prosecute and no statements or time sheets were presented to the Court.
Mindful of Plaintiff's economic situation and lack of assets and the legal research and briefs involved, however, the Court will allow the sum of $3,500.00. The trial was brief, a portion of one day.
The Court has endeavored to consider all relevant issues in arriving at an order of alimony including age, station in life, length of marriage, the child, the financial position of each, their state of health, the net monthly available to Defendant after taxes, the overall economic CT Page 138 situation of each, prospects, the tax consequences and the manner in which the Powerball winnings were secured and the support order and estimated insurance costs. Alimony in the amount of $6,000.00 per month is awarded to the Plaintiff for a term of ten years.
The alimony shall terminate on the death of the Plaintiff if said event occurs within the ten-year term.
The alimony shall terminate in the event that the Plaintiff remarries within the ten-year term.
Mindful of the uncertainties attendant to the Maryland proceedings and its ultimate resolution, the Court directs that the Defendant provide an insurance policy in favor of the Plaintiff in the amount of $360,000.00 to be resorted to only in the event that the Defendant's subsequent financial well being would make it impossible for him to comply with the order of alimony as a result of the Maryland proceedings.
If he had been so inclined, the Defendant years ago could have petitioned for a dissolution of the marital union, mindful of the long separation, but being in another state of his own choosing and providing no support or assistance to his wife or son, presumably, was not inclined to do so. The Defendant should not exclude his wife and son from some small measure of his good fortune.
Austin, J.